*T. A. Hendricks, O. B. Hord, A. W. Hendricks*, and *J. W. Ray*, for appellees.

———————

THE JEFFERSONVILLE, MADISON, AND INDIANAPOLIS RAILROAD COMPANY *v.* RILEY, ADMINISTRATRIX.

INJURY TO PERSON.—*Negligence.*—*Proximate Cause.*—*Railroad.*—In an action against a railroad company for damages for an injury to a person, resulting in death, caused by the negligence of the servants of said company, where the instructions given by the court required the jury to find whether or not the death of the deceased was caused by the act of defendant;

*Held,* that it was not error for the court to refuse to instruct that they should find whether or not the act of defendant was the proximate cause of the death of defendant.

SAME.—In such an action, it is not error in the court to refuse to instruct the jury that the injury complained of cannot be regarded as the proximate cause of death, if the deceased had a tendency to insanity and disease, and the injury received by him, producing his death, would not have produced the death of a well person.

SAME.—*Railroad.*—*Passenger.*—It is not necessary that a person should be on the train of a railroad in order to be regarded as a passenger. As a passenger, he has the right to stand or walk on the platforms provided at stations for the convenience of passengers while the train is stopping for refreshments, and in a street along-side of the track and platforms; and the servants of the rail-

MAY TERM, 1872. 569

The Jeffersonville, Madison, and Indianapolis R. R. Co. *v.* Riley, Administratrix.

road company are bound to exercise the care of a reasonable and prudent man in the discharge of their duties on said platforms and street, and have no right to throw sticks of wood from the train upon such platforms or street, without first ascertaining whether such action would endanger any passenger standing or walking there.

SAME.—*Degrees of Care.*—A railroad company owes a higher degree of care and watchfulness to its passengers than to mere strangers.

PRACTICE.—*New Trial.*—*Evidence.*—*Appeal.*—The action of the court in improperly sustaining or overruling a motion to suppress a deposition, or a part thereof, is cause for a new trial, and must be stated as a reason for a new trial in the court below to entitle it to the consideration of the Supreme Court.

SAME.—*Evidence.*—It is not error to exclude evidence, admissible for one purpose, when offered for another specific purpose for which it is inadmissible.

EVIDENCE.—*Witness.*—The conviction of a person of a felony, which by the Revised Statutes of 1843 rendered him incompetent to give evidence in a court, under the Revised Statutes of 1852 may be shown for the purpose of affecting his credibility.

SAME.—The refusal to admit, as evidence, an *ex parte* affidavit and proceedings thereunder, not ·in the nature of an inquisition, to procure the admission of a person to the insane asylum, was held not erroneous, in an action by the administratrix of an estate of such person, deceased, against a railway company for damages for injuries resulting in his death, the same fact having been shown by other evidence.

NEW TRIAL.—*Evidence.*—*Appeal.*—When tne reason for a new trial is stated simply as the error of the court in the admission of incompetent and irrelevant evidence in the testimony of a certain witness, and the objection is not made more specific in the brief, the Supreme Court cannot know upon what to decide.

DAMAGES.—Damages in the sum of two thousand three hundred and thirty-three dollars and thirty-five cents were held not to be excessive in this case for an injury to a person resulting in death.

APPEAL from the Marion Civil Circuit Court.

DOWNEY, J.—The appellee sued the appellant, alleging in her complaint that, on the 21st day of February, 1867, the defendant was, and now is, a corporation, by virtue of the laws of the State of Indiana, and was then running and maintaining a railroad to and from Jeffersonville, in the State of Indiana, to Indianapolis, in said State; that on said day Frederick Riley, since deceased, was a passenger on one of defendant's passenger trains, then *en route* from Jeffersonville to Indianapolis; that at Seymour, a station on said railroad, the said train stopped to give the passengers an opportunity to procure refreshments, and

while said train was at said station, and not in motion, the said Frederick Riley was standing upon the station platform, at the side of and near said train, and was again about to enter said train to resume his seat therein, before the starting of said train, when one James Wheadon, a brakeman on said train, and then in the employ of said defendant as such, and while attending to the business of his said employment in regulating the fires in the stoves in said passenger cars, so negligently and recklessly deported himself therein that, in throwing a burning stick of wood from said passenger cars, he, with said stick, struck the said Frederick Riley upon the head, inflicting a severe injury thereon, from the effects of which he, the said Frederick Riley, departed this life, at said county of Marion, on the 4th day of October, 1867; and the plaintiff says that said injury was done, and happened to the said Frederick Riley, without any fault or negligence on his part; and plaintiff further says, that she has been duly appointed and qualified, as administratrix of the estate of him, the said Frederick Riley, by letters of administration issuing out of the clerk's office of the court of common pleas of said county of Marion; that she, Malinda Riley, who, as administratrix, brings this suit, was, at the time of the happening of the injury above complained of, and at the time of the death of the said Frederick Riley, his lawful and wedded wife; that there was no issue of such marriage, and that the said Riley left no children surviving him; wherefore plaintiff prays judgment for five thousand dollars.

The complaint was traversed by a general denial filed by the defendant. There was a trial by a jury, a verdict for the plaintiff for two thousand three hundred and thirty-three dollars and thirty-five cents, a motion for a new trial made by the defendant overruled, and final judgment rendered for the plaintiff for the amount of the verdict. There were seventeen reasons assigned for a new trial, as follows:

1st. The verdict of the jury is contrary to law.

2d. It is not sustained by sufficient evidence.

3d. The damages are excessive.

4th. The giving of instructions one, two, three, four, five, and six, on its own motion by the court.

5th. Refusing to give instructions one, two, three, four, five, six, seven, eight and nine, asked by the defendant.

6th. In admitting incompetent evidence in the testimony of Freeman C. Bishop.

7th. In admitting incompetent evidence in the testimony of John Kirkpatrick.

8th. In admitting incompetent and irrelevant evidence in the testimony of Henry Taylor.

9th. In suppressing a portion of the answer to the second question of the deposition of Edwin Cook.

10th. In suppressing a portion of the fifth question in the examination in chief of Jany Cook.

11th. In suppressing a portion of the answer to said question.

12th. In suppressing a portion of the second question in the examination in chief of Jesse Florer.

13th. In suppressing a portion of the answer to said question.

14th. In suppressing a portion of the answer to the sixth question in the deposition of James C. Riley.

15th. In suppressing a portion of the answer to question nine in the deposition of James C. Riley.

16th. In excluding from the jury the indictment against Augustus Roller, and the record of the court in the case showing his conviction, offered by the defendant.

17th. In rejecting the affidavit and other proceedings under which Frederick Riley was sent to the Insane Asylum.

There are nineteen errors assigned, but we think the assignment that the court erred in refusing to grant a new trial, brings before us all the reasons which were urged for a new trial, and requires us to examine as to the correctness of the ruling of the court with reference to them, and that their repetition in the assignment of errors is useless. We are not aware that it has been decided by this court whether

the suppressing of a deposition, or part thereof, or the over-ruling of a motion for such purpose, is a ground for a new trial or not.  It seems proper that the question should be passed upon in this case, as the question is here presented. Motions to suppress depositions, or parts thereof, are generally made and decided before the trial has commenced, but not always.  2 G. & H.  178, sec. 266; *Barber* v. *Lyon*, 8 Blackf. 215; *Hazlett* v. *Gambold*, 15 Ind. 303.  So applications for the continuance of a cause are generally made before the trial has commenced, but not always.  2 G. & H. 198, sec. 323.  But it has been held that the overruling of a motion for a continuance is a ground for granting a new trial, and that it must be urged at that stage of the case, or it cannot be assigned for error, and then only by assigning the improper overruling of the motion for a new trial.  *Kent* v. *Lawson*, 12 Ind. 675.  The first class of reasons for granting a new trial, are these:  "Irregularity in the proceedings of the court, jury, or prevailing party, or any order of court or abuse of discretion, by which the party was prevented from having a fair trial."  We conclude that improperly sustaining or overruling a motion to suppress depositions is cause for a new trial, and must be stated as a reason for a new trial, as was done in this case.  We are confirmed in the correctness of this view from the fact that the eighth class of reasons for a new trial is "error of law occurring at the trial, and excepted to by the party making the application," etc.  We will proceed, then, to examine the causes assigned for a new trial.

Nothing is urged under the first reason for a new trial.

The evidence showed the following facts:  The deceased was a passenger on the train of cars on the defendant's road on the 21st day of February, 1867, from Jeffersonville to Indianapolis.  The train stopped at Seymour for refreshments.  The railroad runs along a street of the town running north and south.  At the point where the train stopped, there is a platform on the east side of the road, between the track and the passenger depot, four hun-

dred and twenty-six feet long, and twenty-one feet wide in front of the depot.    On the west side of the track, there is a private platform six feet wide and one hundred and fifty feet long.    From this platform, near the north end, there is a plank walk to the west side of the street, where the restaurant, or dining rooms, are situated.    The deceased had gone to the restaurant and obtained a cigar, and had returned to a point some six feet from the train, and was standing near the narrow platform, the passengers who were eating not yet having finished their meal.    Wheadon, the brakeman, whose deposition was taken by the defendant, who threw the stick of wood, testified as follows:

"I have a knowledge of the transaction in litigation; it occurred at Seymour, Ind., in February, 1867; the man was a passenger from Jeffersonville to Indianapolis; the train stopped at Seymour fifteen minutes for supper, about half-past four P. M.; the eating house is on the west side of the street, about forty feet from the passenger platform; there is a narrow platform on the west side for accommodation of passengers getting off for meals; the passenger platform is on the east side of the track; this occurred while the cars were waiting for the passengers in the eating house; there was a stick in the stove so long that I could not close the door; it was making a smoke in the car; I took it out of the stove, and took it to the door to throw it into the street; by this time it was beginning to burn my hands sharply, and I was trying to throw it as quickly as I could on the side opposite the regular passenger platform; as I was beginning to throw it I saw no one, but before it had got entirely out of my hands I saw Mr. Riley, if that was his name; it was then too late to stop, but I made an effort to give it a direction over his head; the stick was all afire; it singed his cap, but did not cut through it; he neither fell nor staggered, but immediately ran toward the eating house; I followed and overtook him, when he turned and drew a revolver partly out of his pocket; I seized his arms and asked him if he was hurt; when he saw that I was not going to hurt

him, he said he thought somebody had shot at him, as there was a man on the train who wanted to kill him; then he went into the car and sat down; after the cars started, he commenced talking loudly about the carelessness in throwing a stick that way; he was swearing, using abusive language, and threatening me; Thomas Dailey, the conductor, came and partially pacified him; before Dailey came along I made all the apology I knew how, but he would not accept them; after Dailey passed, I examined his head and his cap; I found no blood; the skin was nowhere broken, and I did not see the slightest appearance of any recent injury; I examined his head because he asked me, and said I had hurt him; he laid my fingers on a bump on the side of his head, left side above the ear; it was about the size of a hickory nut, and also passed my fingers along a ridge that passed around to the middle of his forehead, and said the stick had made these; the ridge was hard; the skin of same color as rest of forehead; the lump was hard and came up to a point or edge, felt like bone and seemed a continuation of the ridge; all this had the appearance of an old injury; think it impossible for the stick to fall around his head that way, for he was standing with his back to me when I threw the stick; had not known the man or spoken to him before that; at the time of throwing the stick there was a young man standing on the platform; he was about twenty years of age; I saw no one else; Riley was in company with a friend; at the time of the occurrence I was a brakeman."

Cross Examination: "The train was a fair load; the train had stopped about ten minutes when I threw the stick; I was standing between the baggage car and front coach; I had a pair of gloves on, with the ends of the fingers worn out, when I threw it; before I threw the stick, I did not step out far enough to look along the platform crossing the street, because the stick was burning my hand, and I began to throw it before I reached the door; it struck the ground about eight feet from where I stood; it fell beyond the man; the narrow platform crossing the street was two feet wide;

Riley was not on the narrow platform; he was just off the platform; he was standing still, with his back to the train; about one-half of the passengers left the train; a portion had returned when I threw the stick; there were two passenger cars; it was a part of my duties that day to attend to the fires; I don't know that it was my duty to throw the stick out as I did, but it was my duty to see that the fire burned, and it would not .burn with that stick in the stove; the bump was on the left side of his head; the ridge extended from the bump toward the forehead, horizontally; I found his cap slightly singed where the stick went by, on the side of the cap, same side with the bump; at first he was scared; he drew a pistol partially from his pocket, and said, after he reached the car, that he came within a hair's breadth of shooting me, that a man on the train wanted to kill him, that when the stick went by on fire, he thought he was shot at; after he got into the car he talked loudly, and used abusive language to me; his complaints were as to the injury and his suffering; his manner from Seymour to Indianapolis was more boisterous, and entirely different from his manner from Jeffersonville to Seymour; think there was no other brakeman on the train; none of the other employees were about when I threw the stick."

Re-examination: "I think there was carelessness in the manner in which I threw the stick; the error was in throwing the stick without looking where I threw it; I should have thrown it between the cars."

The testimony of the other witnesses, concerning the occurrence at Seymour, may vary slightly from that of Wheadon, but in substance it is the same.

John Kirkpatrick testified for plaintiff: "Am engaged in practice of medicine and surgery, and have been so engaged over twenty years; I met Riley on the streets for some months before this injury occurred, and prescribed for him once or twice during that time; I suppose he was twenty-eight or thirty years old; his general health good, so far as I saw; he was rather an active man physically, and of ordi-

nary mental capacity; I never saw him at home until after the injury; I treated him then. He came to my office on 28th of February, 1867; he complained of an injury to his head, and showed me a point that had been bruised from some cause; it appeared to be a recent injury, a slightly bruised condition of the skin, some swelling in the cellular tissue; parts of it were elevated a little above the ordinary condition of the parts; it was not an incised wound, but evidently one from a bruise from some heavy, broad-surfaced object; the bruise had been occasioned by some surface that did not cut through the skin; the length of the bruise was between two and three inches; the bruise extended over two-thirds of the right side of the *os frontis*, crossed the coronal suture a little back from the front edge of the parietal bone; most of it was under the hair; I treated it with cold applications to the head, also constitutional remedies.

"The diagnoses of physicians in cases of this character are not generally clear as in injuries of a different kind. There are two distinct layers of bone separated by a softer substance forming the skull; one of those tables may be injured and the other not; in a great many cases it is difficult to detect with certainty the precise character of the injury; there may be an injury to both tables of the skull; one a fracture, the other a contusion with extravasation of blood. When the inner table is fractured, and the other one is not, it is often impossible to ascertain the character of the injury until the symptoms are advanced, and often there is no absolute certainty at all.

"After Riley first called, I saw him almost daily for a couple of months, and after that time I saw him occasionally. The effect of my treatment on the swelling and external appearances of injury was to dissipate them, but it did not do much to alleviate the constitutional injury; nothing but cold applications were made to his head. I did not feel authorized, from the symptoms, to resort to trephining; that would have been too great a risk. The result of this injury

very materially impaired the general health of Riley; he became feeble, emaciated, and afflicted with aberration of mind, which afterward increased; his wife and mother-in-law attended him. It was four or five weeks before my attention was called to the fact that he was affected with insanity. He surprised me one day by coming into my office and talking incoherently on elections; he spoke of being elected to an office, and of giving me one; it may have been two or three weeks after I commenced treating him; there was not always the same degree of excitement about the brain, but the paroxysms seemed to increase with each return, until he became entirely insane.

"There are so many causes of insanity, and so many varieties of it, that it is very difficult to find a rule to indicate it on all occasions; and I do not know that the books lay down any uniform rule by which you can detect it. I considered Riley an insane man after the time I have mentioned, when I detected those indications of insanity; there was scarcely any subject that he talked about on which his mind was correct; he had a good many ideas in regard to personal danger; his mind wandered suddenly from one subject to another; I tried often to confine him to one subject, and there was always some erratic display that indicated he was insane; he seemed to be sound on no subject at all; it was almost a complete mental aberration; his complaint of pain in the head was always uniform. Before the time of the alleged injury, his mind seemed correct on most subjects, and after the injury, up to the time I spoke of, when he came to my office and surprised me by talking incoherently. He never was a man of a very vigorous mind. He placed his hands to his head very often; he would get up before a looking glass, take off his coat, and stand in a pugilistic attitude; he seemed to think some one was in front of him who wanted to fight, and he would go through motions as though in combat with him; he very frequently expressed pain, and pressed his hand on his head quite as

often, and would sit sometimes for five minutes in that position. The soreness on the outside disappeared in ten or twelve days; I do not think the treatment did him any good; there was no abrasion of the skin. I saw him last about one week before he went to the asylum; when I saw him last his mental ailment was increasing; he came back from the asylum in October, I think; I saw him the next day after he came back, at Mrs. Bouchet, his mother-in-law's; he was very much reduced, a mere skeleton, with not one single faculty left, as it seemed to me; it was a low muttering delirium; he was so much changed in appearance that I would not have known him. He survived a few days after he came home; I saw him two or three times a day during that time; at that time he made the same complaint about his head, and held his hand, I think, on the left side of his head. I saw him after his death, looked at his head, saw no other mark of injury besides this one; when I first saw him I took it to be a recent injury, and prescribed for it as such. From what I saw of him before he went to the asylum and after he returned from the asylum, I was very clearly of the opinion—the impression—that the injury he received was the cause of his death."

Cross examination. "Cannot say how long I knew him; I saw him frequently on the streets four or five months before his injury; saw him at my office, and prescribed for him; I think the injury in his head was on the left side, between two or three inches long; not more than one inch of it was covered with hair; Its appearance, as far as exposed on the forehead, was a contusion; it had discolored the skin, and something of a rise, perhaps three-fourths of an inch; the elevation on each side gave evidence of a depression; it was a double ridge with a depression in the center; it was softer in the middle than at the sides; there was considerable elevation and discoloration; think any one could have seen it at a distance of five or six feet; I removed the swelling in the course of a few days.

"I do not know that there is any uniformity in regard to

where the pain is felt; ordinarily, the pain is felt where the blow is received, and when it is felt on the other side, it is considered rather an anomalous case; there are some instances where a blow is received on the head, and the effects of it are not manifest for months, or even years, both as to the mind and pain; I do not think, though, that would be the rule by any means; before Riley went to the asylum, the pain seemed to center in his forehead; he was a nervous and excitable man, rather more than common; he had a vague idea that some one was going to hurt him; on one occasion he wanted to get out the back window; he said some one was after him, and he would run up stairs and close the doors; I made up my mind, from what the patient told me, and from what I saw, that the injury I have described in this case produced the result I have described; I was led to that conclusion because he described to me the symptoms I expected to find; there were fever, pain, and swelling about his head, indicating congestion; extravasation of blood about his head, cold extremities, followed by febrile symptoms; a peculiar expression about the eyes, quite common to injuries of that kind; and a dilating and contraction of the pupil of the eye; in some cases that would indicate a recent injury to the brain; a blow that would produce such an injury as that, would knock such a man as Riley down, if he was standing off of his guard; a man standing behind Riley could not have inflicted such a blow, unless he had been standing above him, or was a very tall man."

Re-direct examination: "I do not know how long after the injury was inflicted before I saw Riley the first time; in wounds such as this was, I have seen ridges appear within a half an hour or an hour after the blow was inflicted; in older persons it would be longer than in younger ones; taking a person of a family who are predisposed to insanity, with injuries inflicted on the head at a long time before, such a blow as this would probably have caused death and the consequences which I observed in Riley's case."

The testimony of several other witnesses for the plaintiff

tended to show that the insanity and death of the deceased resulted from the injury received by him at Seymour. There was evidence on behalf of the defendant strongly tending to show hereditary insanity in the family of the deceased; that his habits were such as might have produced insanity; and several professional witnesses testified in opposition to the conclusions of Dr. Kirkpatrick. It is not for us to say, however, that the jury should have been controlled by the evidence of the witnesses for the defendant, rather than that of those for the plaintiff.

We think the evidence was such that we cannot disturb the action of the court in refusing, for this cause, to grant a new trial.

We cannot say that the damages are excessive. If the jury were satisfied, as they seem to have been, that the evidence was sufficient, they did not give excessive damages.

The instructions given by the court on its own motion, to which exception was taken, are as follows:

" 1st. The first question for the jury to answer is, was the death of Frederick Riley caused by the wrongful act of the defendant, or the servant of the defendant?

"This question properly divides itself into two branches, that is to say, did the death of Riley result from the act of defendant? and if so, was the act a wrongful one?

"In investigating the first branch of this question, it is proper for the jury to take into consideration all the circumstances of the case as developed in the evidence, the condition of the physical health of the deceased at the time of the act, his mental condition as bearing upon his physical health and the cause of his death, and any, even the smallest fact in evidence, which may throw light upon this matter.

" 2d. If Riley came to his death, not from the act of the defendant's servant, but from disease with which the act of such servant had nothing to do, then your verdict should, without further inquiry, be for the defendant. But if the deceased, from other causes, was in such physical condition that the act of the defendant's servant, which in the case of

a healthy person would not have produced or caused the same effect, yet in this special case did cause the death, then you should answer this first branch of the inquiry in the affirmative.

"If, then, you find, from a preponderance of evidence, that the death of Riley was caused by the act of the defendant's servant, in the line of his occupation, you should further inquire whether that act was wrongful or negligent.

"3d. Riley, whether as a passenger on defendant's cars, or as a citizen, had a right to stand in the street, in or alongside of which the defendant's railroad was located, and being properly there, the defendant had no right, its servant no right, to throw sticks of wood from the train to the street, without first ascertaining whether such action would endanger the person of any one walking or standing there.

" 4th. If Riley, being a passenger at the time of being struck, was standing or walking upon a platform provided for the convenience of passengers in leaving or entering the train, he had a right to be there; and while the defendant had a right to throw wood upon the platform from the car, her servants were bound to exercise care in such act, such as a reasonable and prudent man would exercise in such a place at such a time.

"If the act of the defendant's servant, in throwing the wood from the car platform, without seeing whether the act would endanger the person of another, was not that of a reasonable and prudent man, under the circumstances of time and place, then the servant was guilty of negligence, for which, if causing death, the defendant would be liable, unless the deceased was also guilty of negligence which contributed to the happening of the injury.

"If the injury, if any, done to Riley, was the result of mere accident, and not of carelessness on the part of the servant of the defendant, then the act was not wrongful.

"5th. If the jury find, then, from the preponderance of the evidence, first, that the act of the defendant's servant caused the death of the deceased; and, second, that the act so

causing it was wrongful, as I have defined it, and that the deceased did not, by his own negligence, contribute to the happening of the injury, then your verdict should be for the plaintiff.

"6th. If the jury find for the plaintiff, they should assess some amount in damages. The law which confers the right of action is for the purpose of providing pecuniary compensation for the life which was lost by negligence.

"There is no fixed measure of the compensation. It is proper for the jury to take into consideration the circumstances and occupation of the deceased in making such an estimate.

"If his avocation was a criminal one, any advantage to be derived from it should not be taken into consideration in making such an estimate. What the jury should estimate as damages is, as nearly as the jury can estimate it, the value in money of the life that was lost. The jury should exercise a sound discretion in making such estimate; unless the act was one involving moral turpitude, the damages can only be compensatory, and not vindictive."

The instructions asked by the defendant and refused by the court are as follows:

"First. If the jury believe that the injury inflicted upon the head of Frederick Riley, by the brakeman of defendant, would not have produced insanity and death, if it had not been for the fact that he had prior to that time received severe injuries on his head, was predisposed to insanity, and had led a life of dissipation, and believe that insanity followed the blow merely because of these pre-existing circumstances, the blow cannot be regarded as the proximate cause of the death of said Frederick Riley.

"Second. The plaintiff cannot recover unless it is shown to your satisfaction by a preponderance of the evidence, that the blow inflicted on the head of Frederick Riley by the brakeman of defendant was the proximate cause of his death.

"Third. If the jury should find for the plaintiff, the amount of the recovery is not left by the law to the uncontrolled

discretion of the jury. It is their duty, in estimating the damages, to consider the exact situation of Frederick Riley, his occupation, habits, family, and earnings.

"Fourth. There can be no recovery in this action, unless the defendant, by its employee, was guilty of some wrongful act. If you find that whatever injury, if any, was done to Riley was the result of accident, and not of carelessness on the part of employee of defendant, you should find for the defendant.

"Fifth. If the evidence shows you that Riley, deceased, at the time the stick was thrown, was out of the cars, and not upon the platform or railroad, but standing in the street, the defendant is not responsible for any injury suffered by him, because he was a passenger. The rule of liability would be the same as though he had not been a passenger.

"Sixth. The statute under which this suit is brought bases the right of recovery on a wrongful act or omission causing death. In determining whether the defendant by its employee was or was not guilty of such wrongful act, in this case, the same rule applies as though Riley had not been a passenger. The company by its contract to carry him, became bound to use extraordinary care during the transit, and would have been liable to him under that contract for any injury resulting from the want of such care. But, under the statute referred to, the question is a different one. The wrongful act referred to is not an act that is wrong, merely because it is in violation of a contract. It refers to an act or omission that in its own nature and operation is tortious and wrongful independently of contract. The rule of liability here is no more stringent than it would have been if Riley had not been a passenger.

"Seventh. Unless you find that the brakeman, in throwing the stick from the cars, failed to use ordinary care and prudence, you should find for defendant. If he did act with such ordinary care and prudence, the defendant is not liable.

"Eighth. The plaintiff, if entitled to recover anything, is only entitled to recover the actual pecuniary value to her of Riley's life. In estimating that pecuniary value, money that

he might have made in the avocation of a professional gambler is not to be allowed. That avocation is criminal, and she is no more entitled to recover on account of money that might have been derived through that source, than she would be to money that might be obtained through theft or robbery.

"Ninth. In estimating the value of a life, the jury can only consider it according to the habits and occupation of the person at the time of his death, and this cannot have a calculation upon a possible future improvement of habits and occupation."

The objection to the first instruction given is, as we understand the brief of counsel, that it does not sufficiently and clearly inform the jury that the blow must have been the proximate cause of the death of the deceased. On this subject the defendant asked charges one and two, which were refused. Number one stated what would not be the proximate cause, and number two informed the jury that the blow must have been the proximate cause of his death. In number one the court was requested to inform the jury that if the injury inflicted upon the head of the deceased would not have produced insanity and death if it had not been for the fact that he had, prior to that time, received severe injuries on his head, was predisposed to insanity, and had led a life of dissipation, and the jury believed the insanity followed the blow merely because of these pre-existing circumstances, the blow could not be regarded as the proximate cause of the death of the deceased. Insanity may have been from one cause, and death from another. The insanity may have resulted from the "pre-existing circumstances," and the death may have been caused by the blow. If the jury should find that the insanity resulted from the predisposing causes enumerated, it would not follow that they should find that the blow could not be regarded as the proximate cause of the death of the deceased.

If it was intended to have the court say to the jury, that when a person has a tendency to insanity or disease, and

receives an injury which produces death, but which would not have produced death in a well person, the charge was rightly refused. If death was the result of the pre-existing circumstances, and the injury had nothing to do with producing or accelerating the result, then the injury would not be the cause of death.

If by the proximate cause was meant, in the second instruction refused, what was indicated by the first charge, the second charge was correctly refused. The charge given by the court required the jury to find that the death of the deceased was caused by the wrongful act of the defendant. This was all that the statute required to be found to render the defendant liable. The jury could hardly have misunderstood the instruction. If the deceased died merely, and his death was not caused by the wrongful act of the defendant, the jury must have understood that they were to find for the defendant. Indeed, the court so expressly told the jury in the second charge given.

The third instruction given informed the jury that the deceased, whether a passenger or not, had a right to stand in the street, in or along-side of which the railroad was located, and, being properly there, the defendant had no right to throw sticks of wood from the train to the street, without first ascertaining whether such action would endanger the person of any one walking or standing there. This instruction, so far as it relates to a passenger, is correct; and it may also be correct in its relation to one not a passenger; but we do not find it necessary to decide this in this case.

The fourth instruction given is, we think, fully sustained by authority. It is not necessary that a person should actually be on the train of the railroad, in order to be regarded as a passenger, and have the rights of such against the company. He may sustain that relation and not be actually on the train or in a car. This, as well as other companies, had its places of stopping for refreshments. Accommodations for leaving the train, and going to, and returning from, the dining rooms, had been provided, and

passengers were thus invited to leave the train for that purpose. This was a necessary and proper purpose. The deceased was not negligent or in fault in leaving the train, or in standing by it on his return. On the contrary, he was doing only that which was customary, and what he was, by the surroundings, invited and expected to do. It is true that he was not on the main platform in front of the depot, for that was on the other side of the train from the dining room. Nor does the evidence show that he was actually standing on the narrow platform on the west side of the train ; but he was near to it, and it seems to us that it is not material that he should have been exactly on that platform. We presume that there was no regulation or usage which required passengers to walk on the planks and nowhere else.

In the case of *McDonald* v. *The Chicago and North Western R. R. Co.*, 26 Iowa, 124, after a full examination of the authorities, this statement is made of the law: "Upon reason, that is, enlightened common sense, applied to the relation which railway companies sustain to the public, and applied to the nature of man and the mode in which the business of carrying passengers is practically and usually transacted, and upon the authority of decided cases, we are justified in laying down the following general rule as to the duty of such companies, to wit, that they are bound to keep in a safe condition all portions of their platforms and approaches thereto, to which the public do or would naturally resort, and all portions of their station grounds reasonably near to the platform, where passengers or those who have purchased tickets with a view to take passage on their cars, would naturally or ordinarily be likely to go." The same doctrine was affirmed in the same case, when again in that court, in 29 Iowa, 170. See, also, *Knight* v. *The Portland, Saco, and Portsmouth Railroad Co.*, 56 Maine, 234.

The two latter sentences of the fourth charge seem to us to lay down the law correctly on the subject of negligence, and covering the same ground as the fourth charge asked by the defendant, rendered it unnecessary to give that charge.

No specific objection is made or occurs to us to the fifth and sixth charges given.

The fifth charge refused was correctly refused, if we are right in our opinion that the deceased was to be regarded as sustaining the relation of passenger to the railroad company.

The sixth charge refused asked the court, in substance, to say to the jury that the relation between the company and the passenger had nothing to do with the question as to the right of action given by the statute. Assuming, which we think we may do, that the words "wrongful act or omission," used in the act, mean the same as negligent act or omission, then it follows that there may be negligence when the relation of carrier and passenger exists, where the same act or omission would not be negligent if that relation did not exist. The statute does not say whether the act or omission, which gives the right of action, must be wrongful in itself, or whether it may be wrongful because it violates a duty imposed by contract. We think it may be either. The cases in this court have mostly been based upon acts of negligence or omissions which showed a want of proper care and diligence in cases where there was no relation resulting from contract, such as where a person has been killed by a train of cars at the crossing of a highway or street. But there are numerous cases where the relation between the parties and the duties imposed grew out of contract, and the negligent act or omission was in violation of that contract. It is scarcely necessary to cite authorities to show that a railway company owes a higher degree of watchfulness and care to those sustaining the relation of passenger than to mere strangers sustaining no such relation to the company. But see *The State of Maryland* v. *The Baltimore and Ohio Railroad Company*, and the same parties reversed, 5 Am. Law Reg. (N. S.) 397.

The matter contained in the seventh, eighth, and ninth charges refused was given in the charges of the court, in substance, and the court was not bound to repeat it.

The sixth, seventh, and eighth reasons for a new trial are

for the admission of incompetent evidence in the testimony of Bishop, Kirkpatrick, and Taylor. It is not stated what part of their evidence was incompetent, and the objection is not made any more specific in the brief. We can decide nothing on the point, because we do not know upon what to decide.

The ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, and fifteenth reasons for a new trial relate to the suppression by the court of parts of depositions taken by the defendant. We have not been able to see any material error in this action of the court. Most of the suppressed parts of the depositions relate to the occupation of the deceased, showing that he was a professional gambler. This fact seems to have gone to the jury in the testimony which was admitted, and the fact was laid before the jury in the charge of the court. There was no error in the action of the court in this matter.

The sixteenth reason for a new trial is, that the court excluded from the jury an indictment against one Roller, who, was a witness for the plaintiff, and had testified for her, and the record of the court showing his conviction thereon of the crime of robbery. The statute of 1843 had this section:

"Every person, who may hereafter be duly convicted of the crimes of treason, murder, rape, arson, burglary, robbery, manstealing, forgery, or wilful and corrupt perjury, shall, ever after such conviction, be deemed infamous, and shall be incapable of holding any office of trust, honor, or profit, voting at any election, serving as a juror, or giving evidence in any court of justice."

While the present statute provides that no person offered as a witness shall be excluded from giving evidence, either in person or by deposition, in any judicial proceeding, by reason of incapacity from crime or interest, it at the same time provides that any fact which before its enactment might have been shown to render a witness incompetent might thereafter be shown to affect his credibility. 2 G. & H. 171, sec. 243.

As the conviction of Roller of the crime of robbery would, prior to the statute, have rendered him incompetent, it follows, we think, legitimately, that under the present statute, his conviction was competent evidence to affect his credibility. But the bill of exceptions shows that the record was offered, first, " to identify Riley as the man who was with Roller, to fix the date," and when excluded as evidence for that purpose, it was offered "for the purpose of showing the associations and character and social position of Riley." For these purposes, we think it was not admissible. It is not shown how it was essential to introduce it to fix a date, and it had no tendency to show the character or social position of Riley. He was not a party to the record in any way. The seventeenth and last reason for a new trial is, that the court improperly excluded the affidavit and other proceedings under which Riley was sent to the insane asylum. The whole object of this proceeding was to procure the admission of Riley to, and his confinement and treatment in, the asylum. These facts were in evidence, and, so far as we can see, as fully shown as they could have been by the papers sought to be given in evidence. The affidavit was *ex parte*, and there was nothing in the nature of an inquisition in the proceedings upon it. It is probable that, for some purposes, these papers might, in a proper case, be admissible in evidence, but in this we do not see any reason for their admission.

The judgment is affirmed, with costs.

*T. A. Hendricks, O. B. Hord*, and *A. W. Hendricks*, for appellant.

*A. G. Porter, B. Harrison*, and *C. C. Hines*, for appellee.