AVERY, J., concurs, but dissents from so much of the opinion of the Chief Justice, as (according to his construction of it) makes the liability of defendant dependent upon the question whether the agent was acting within the scope of his employment, he holding the view that the liability of a common carrier for the acts of its servants is absolute as to injuries inflicted by them on persons under their protection. He also emphasizes his view that the principle decided by this case applies to common carriers, and not to master and servant generally.
The following issues were submitted to the jury by consent of counsel:
"1. Did defendant wrongfully kill Key through its agent, Lifsey?
"2. What damage has the plaintiff sustained by reason of said killing?"
It appeared in evidence that the deceased (the intestate of plaintiff), having a pass (issued for valuable consideration), was a passenger on the defendant's railroad on 22 December, 1892. His baggage was checked to Garysburg, but he left the train at Bellfield, north of Garysburg, retaining his baggage checks.
The plaintiff introduced Robert Harris, who testified that he lived at Garysburg, and was studying telegraphy under John Lifsey, who *Page 410 
was telegraph operator and agent at the depot and had charge of all the railroad's business there. He further said:
"On 29 December, 1892, Key came to the depot after his baggage. When he got there he walked in the depot and said `Good morning' to Mr. Lifsey and myself. Mr. Lifsey said `Good morning.' He (594) then said, `I have come after my trunks.' Mr. Lifsey said, `All right,' and told him there were charges on them amounting to $1.70. Mr. Key said. `Are you going to make me pay that? Mr. Lifsey said, `Those are my instructions.' Mr. Key said, `Write me a receipt for it; I intend to see where it goes.' Mr. Lifsey told him, `All right.' He then handed him a five-dollar bill, I think. He then asked me to help him put in the trunks. I went out to help him get the trunks in the buggy, and he said, `Do you think I can take both at the same time?' I told him I did not. He then said, `I will go back in the office and get my receipt and change and came back after the other.' He then went back in the depot and went in the room where Mr. Lifsey was sitting, and took a seat opposite the stove. He went up to Lifsey and said, `I intend to see where this money goes. I intend to see that you don't steal this. You and you _____ _____ father-in-law, a _____ ______ rascal, have been trying to defraud me out of every _____ _____ cent I have made since I have been at this place; and, now, ______ ______ you! I intend to have revenge or blood _____ _____ you!' Mr. Key then said, `Hand me the receipt and change.' Mr. Lifsey gave him his receipt and change, and Mr. Key started to go out, and as he got within two steps of the door Mr. Lifsey shot him in the back of the neck."
Q. "Did Mr. Key bring down his checks with him when he came?"
A. "Yes, sir; I think he did."
Q. "When he was going out of the office, did you see the money and the receipt in his hands as he was going out towards the door?"
A. "Yes, sir."
Q. "Were they both in one hand, or the receipt in one and the money in the other?"
A. "I don't remember."
Q. "Did he make any remark as he was going out of the door?"
A. "No sir; I don't think he did."
Q. "Who had charge of the Company's business at that depot?"
(595) A. "John Lifsey."
Q. "Whose business was it to take care of the premises and to preserve and keep order there?"
A. "Mr. Lifsey's." (Objection by defendant; objection overruled; exception.) *Page 411 
Q. "Whose business was it to attend to baggage stored and to deliver baggage at that place?"
A. "Mr. Lifsey's."
Q. "After Mr. Key fell with his face on the doorsill, about where did the doorsill strike his body? How did he fall?"
A. "He fell foremost out of the door, with his breast on the doorplate, but his feet inside of the house, and with his head, I think, on the first or second step."
The witness further said that when Key started away from Lifsey the latter was sitting at the table where the telegraph instruments were, and arose as soon as Key walked off toward the door, and got his gun from a table on the other side of the room. Witness tried to prevent Lifsey from shooting Key, but before he could interfere Lifsey shot Key in the back of the neck. The latter fell with his face down on the front doorsteps. Witness asked Lifsey, "Why did you shot that man?" The reply was, "How can I help it when a man comes in my office and curses and abuses my father-in-law and myself as he did?" Witness testified further that Lifsey had charge of the company's business and premises at Garysburg, and also attended to the care and delivery of baggage.
John Lifsey, witness for defendant, testified as follows: (596)
Q. "Will you state the circumstances under which the killing of Mr. Key occurred?"
A. "I was the agent for the Petersburg Railroad at Garysburg. On the morning of the 24th, I think it was, I am not sure, I had made arrangements to go home to hunt, and the day I was to leave this trunk came down, and I knew he did not know about the new rules in regard to the storage of baggage, and I notified Mr. Harding and Kit Foster to tell him when he came that we had new rules in regard to charging storage, and if the trunks remained after a certain time we would have to charge storage. If he removed them by Monday it was all right. When he came they told him about it. When I got back I found the trunks still there and asked why they had not been removed. I then told Kit Foster to tell Mr. Key that the charges were still going on and ask him to remove the trunks, and said, `I don't want him to have to pay storage on it.' On the morning the trouble occurred I had asked permission from the company to go hunting for a few hours and they had given permission to go until 12 o'clock. Just as I was in the act of leaving, Mr. Key came in for the trunks. I asked him if he had his checks, and he said he had. I told him I was sorry I had to charge him the storage, but was compelled to do it under the rules or pay it myself, and he said, `The hell you are! I told him *Page 412 
yes, it was my instructions. He then said, `I understand it; I understand it all; take your money,' and handed me a five-dollar bill. He said, `You and that _____ _____ daddy-in-law of yours have been trying to steal from me ever since you have been in the town.' While I was writing the receipts he was walking behind me cursing and stamping the floor. I asked Mr. Harris to help him put the trunk or the buggy. When he got back to the office I handed him the receipt and change, and he stepped back to the lattice door and said, `I will (597) see that you do not steal this. You and that _____ _____ old daddy of yours have been trying to steal from me, but now I am going to have revenge,' and he put his hand on his back pocket, and I grabbed the gun and shot him."
Witness further testified that before he shot Key he thought the latter was going to shoot him, having heard threats that he intended doing so. Witness further said he was very much frightened, because Key was a larger man than himself. Witness said he did not shot deceased in the performance of any duty he owed to defendant; and that he had done nothing to provoke deceased. Witness was subsequently tried for the homicide and was acquitted.
The defendant prayed for the following instructions:
"1. If the jury believe the evidence, the killing of Key by Lifsey was not done on behalf of defendant, nor in furtherance of the business of the defendant, and the response to the first issue should be `No.'"
Declined; defendant excepted.
"2. There is no evidence that Lifsey killed Key by authority, direction or order of defendant, either express or implied, and therefore the response to the first issue should be `No.'"
Declined; defendant excepted.
"3. If Lifsey killed Key because of the insult offered him by Key, and not for the purpose of protecting defendant's goods or preventing a trespass on defendant's property, the jury should respond to the first issue `No.'"
Refused, except as given in charge; defendant excepted.
"4. Unless you have been satisfied by a preponderance of evidence that Lifsey killed Key with a view to defendant's service, or by order of defendant, the jury should respond to the first issue `No.'"
Declined, except as given in charge; defendant excepted.
"5. If the killing of Key by Lifsey was the result of the (598) insulting or threatening language and actions of Key, and because of previous grudge, it was not done in the service of defendant, and the jury should respond to the first issue `No.'"
Declined, except as covered by charge; exception by defendant. *Page 413 
"6. If the company owed any duty of protection to Key while he was in the warehouse, if you believe the testimony, his conduct while there was so violent and abusive that he broke the contract and forfeited all right to said protection."
Declined; exception by defendant.
The Judge charged the jury as follows:
"This is a civil action brought by the plaintiff, administrator of Charles Key, to recover damages for the wrongful killing of the said intestate by the defendant company through its agent, John Lifsey. The plaintiff alleges that on 29 December, 1892, his intestate had two trunks in the defendant's warehouse, or depot, at Garysburg, N.C. which a few days before had been shipped from Petersburg, Va., and for which the said intestate held checks; that on said 29 December, 1892, in compliance with a notice from defendant's agent, John Lifsey, he went to Garysburg to pay the charges and to get the trunks; that he paid the charges, $1.70, and while engaged in removing his trunks, and before he had completed their removal from the depot, the defendant, through its agent, John Lifsey, wrongfully killed his intestate.
"The defendant says that it is true that John Lifsey was its agent at Garysburg, and as such had charge of the defendant's business there on 29 December, 1892; that on said day it sustained the relationship of warehouseman to the said Key; that it owed to the said Key the duty of carrying for his trunks and of delivering them when called (599) for. It is also admitted that on 29 December, 1892, the said Key came to pay the charges and take his said trunks and before they were removed from the said depot, and while said Key was engaged in removing his trunks, he was shot and killed by the defendant's agent, John Lifsey; but the defendant says that it is not liable in this case in damages for two reasons:
"1. That the killing of Key was not wrongful; that at the time of the killing Lifsey had reasonable grounds to believe and did believe he was in danger of losing his own life or suffering great bodily harm, and so shot and killed the said Key in self-defense.
"2. The defendant says it is not liable, even if the killing was wrongful, because the said John Lifsey was not acting within the scope of his employment, and that the act was in no way connected with the business of the defendant. This is substantially the contention of the parties, and to determine the matter by agreement, these issues are submitted to you, which you are to answer according to the testimony as you have it from the witnesses and the law as you have it from the Court:
"First issue — Did the defendant wrongfully kill Key through its agent, John Lifsey? *Page 414 
"Second issue — What damage is the plaintiff entitled to recover on account of said killing?
"If the jury find from the evidence that at the time of the killing Lifsey had reasonable grounds to believe or did believe he was about to lose his life or suffer great bodily harm at the hands of Key, the killing was not wrongful, and your answer to the first issue should be `No.' And this would be so whether there was any real danger or not. But of the reasonableness of this apprehension the jury, and not Lifsey, must be the judge. (The killing being admitted, the burden is upon the defendant to show justification by a preponderance of proof.) (600) You are instructed that no language, however abusive or insulting, will justify killing, or even an assault. If you find the killing was wrongful, you will next inquire whether at the time Lifsey was acting within the scope of his employment. If the jury find that the killing was in consequence of an old quarrel or grudge about land, and not connected with the delivery of the trunks, Lifsey was not acting within the scope of his employment and the defendant would not be liable, and your answer to the first issue should be `No,' even if you find the killing was wrongful. And in passing upon this question it is your duty to take into consideration the acts and words of Key concerning Lifsey. But if the quarrel arose and the killing was the result of the quarrel about the delivery and storage of the trunks and the payment of the charges thereon, then Lifsey was acting within the scope of his employment and the defendant would be liable, and you should answer the first issue `Yes,' provided you find the killing was wrongful. So, if you find from the evidence that the killing was wrongful, and that at the time Lifsey was acting within the scope of his employment, as I have just explained, you will answer the first issue `Yes'; otherwise you will answer `No.' If your answer be `no,' that ends the case; but if your answer be `Yes,' you will next consider the second issue, What damage is the plaintiff entitled to recover on account of said killing? The damage is a money consideration only, as a compensation for what Key, if he had lived, could reasonably have been expected to render to his family, and in passing upon this question it is your duty to consider the age of Key, his physical condition, habits, skill, industry and means of making money. If you believe the evidence, (601) he was a skilled workman and mechanic; he was earning one dollars per month; he was thirty-two years old, in good health, and, by the mortuary table, had an expectancy of thirty-four years. This is the law of the case as I understand it, and you must apply the facts and consider this case as you would a case between two of your neighbors." *Page 415 
Defendant excepted to his Honor's charge to the jury as follows:
"1. The killing being admitted, the burden is upon the defendant to show justification by a preponderance of proof.
"2. You are instructed that no language, however abusive and insulting, will justify a killing or even an assault.
"3. But if the quarrel arose and the killing was the result of the quarrel about the delivery and storage of the trunks and payment of the charges thereon, then Lifsey was acting within the scope of his employment, and the defendant will be liable, and you will find the first issue `Yes,' provided you find the killing was wrongful.
"4. If you answer the first issue `Yes,' you will next consider the second issue, What damage is the plaintiff entitled to recover on account of said killing? The damage is a money consideration only, as a compensation for what Key, had he lived, could reasonably have been expected to render to his family. In passing upon this question it is your duty to consider the age of Key, his physical condition, habits, skill, industry and means of making money. If you believe the evidence, he was a skilled workman and mechanic; he was earning $100 per month; he was thirty-two years old, in good health, and, by the mortuary table, had an expectancy of thirty-four years."
5. The defendant further excepted for that his Honor failed to charge that the burden was upon the plaintiff to show by the preponderance of the testimony that the killing of Key was done by Lifsey in the furtherance of the business of the railroad (602) company.
This exception was made for the first time in case on appeal, except as made for refusal to give instructions asked.
6. Defendant further excepted to the refusal of his Honor to give the instructions embraced in the defendant's prayers for instructions.
The jury responded to the first issue "Yes," and to the second issue "$12,000."
Defendant moved for a new trial for errors as set out; motion denied; judgment for plaintiff, and appeal by defendant.
When the plaintiff's intestate purchased his ticket at Petersburg and had his baggage checked to Garysbury, the contract for their safe delivery at the latter place was complete. The Passenger's exit from the train at Bellfield discharged the contract as to him as a passenger, and we have only to consider the duties and liabilities of the parties as to the baggage, consisting of two trunks. The contract as *Page 416 
to the baggage, however, continued to the point of delivery and until the delivery was made.
Common carriers are insurers, subject to a few reasonable exceptions. They are held to exercise the greatest practicable care, the highest degree of prudence, and the utmost human skill and foresight which have been demonstrated by experience to be practicable. They are so held upon the grounds of public policy, reason and safety to their patrons. (603) The exceptions are the acts of God and the public enemy. If these be the proximate cause, and without any neglect on the part of the carrier, then he is not liable in damages. He is, against all perils, bound to do his utmost to protect against loss or damage. and must use efforts proportioned to the emergency to ward it off. If he fails to do so he remains liable, although the act of God may have been the immediate cause of the mischief.
Passengers are entitled to protection from the carrier's agent against assaults or insults from their own employees, from other passengers or persons on the train, whether such persons are rightfully on the train or not. The reason of the above rigid rules is that the passenger and his baggage, during the transit, are in the possession of and under the immediate supervision and control of the carrier's agents, such as the conductor and baggage master, and hence the difference in degree of the liability of the defendant as a carrier and as a warehouseman. We have not undertaken to cite the authors and decisions on the above questions. They are numerous and are collected in 16 A. E. Enc., on page 387.
The contract was to deliver the baggage at the terminal point, and it continued until the delivery was made. The transfer of the baggage from the train to the warehouse did not terminate the contract, but affected only the degree of care required in the two positions. The reason for the strict rule to be observed by the carrier as such, already pointed out, did not, in the nature of the circumstances, apply to him as a warehouseman, as the baggage could not be at all times under his immediate observation. In the latter capacity the defendant was only required to exercise ordinary care whilst the goods remained in his custody.Example: In Neal v. R. R., 53 N.C. 482, it was held that goods in an ordinary wooden house at the station, fastened with iron (604) locks and bars, the agent residing 200 yards from the warehouse, was ordinary care, and the railroad was not liable for the loss of the goods by theft. If the passenger does not claim his baggage within a reasonable time after arrival at its destination, the carrier becomes a mere bailee. Under this modified obligation of bailee, or warehouseman, he is bound to exercise ordinary care in keeping the baggage *Page 417 
until called for or disposed of in some legal way. This modified obligation of the carrier is not an independent one, arising from the accidental circumstance of the baggage being left on his hands, but is imposed by the contract of carriage, and rests upon the carrier with whom the contract was made. It is not suggested, however, that the trunks were not properly cared for in this case. The defendant was not a gratuitous bailee, as it had the right to charge for storage and did charge and collect it.
On application the plaintiff's intestate had received one trunk when he was informed of the storage charge (the other trunk not being yet delivered), when he became angry and, whilst the agent was writing and delivering the receipt and receiving the money, he severly abused the agent in his office and, receiving his receipt and change, started out of the office and was about the door when the agent picked up his gun and shot him in the back of neck, when he fell out on the door steps and soon died from the shock.
A patron of the defendant, whilst in his warehouse on business connected with the road, is entitled, from defendant's agent, to protection against assaults or insults from any one. The language of the deceased to the agent was rude and wrong, for which the agent had a right to expel him from the premises by using such force as was (605) necessary and no more. The offensive language of the deceased, however, did not justify or excuse the violence of the agent, and if his violent act was done within the scope of his employment or line of duty, then his employer, the defendant, is liable in damages for the injury complained of, by reason of the original contract and the act of the agent whilst so engaged. Was the agent's act in the course of his employment and whilst about the master's business? No decisive test can be given, but in all cases the question whether the act was committed by the servant in the service of his employer or for his own purpose is one for the jury, in view of all the circumstances. Wood Master and Servant, 594; Hussey v. R. R.,98 N.C. 34. In this case that question was submitted to the jury in the charge of the court, and by their verdict the fact that the agent was acting within the line of his employer's business is settled in the affirmative.
The full briefs of counsel and their able argument on each side assisted the Court greatly in the consideration of this case. We do not find it necessary to refer to their numerous citations, but will do so as to some of them. Jones v. Glass, 35 N.C. 305, relied upon by defendant, was in the case of an overseer engaged in his employer's business. In the exercise of his proper duties, he used excessive force and seriously injured the slave, and his employer was held liable. The *Page 418 
quotation from the opinion on page 308 was that the driver left the track and ran over a man, and the master was held not liable, because the driver was not doing the business his master had put him about. No authority is cited, and without controverting that statement it is sufficient to say that, according to the verdict, the agent in the present case was in the line of his duty.
Wesson v. R. R., N.C. 379. Here the defendant had let out the building of the road to contractors, who whilst working committed (606) a trespass on adjacent lands without the knowledge of the defendant. The Court said a master is not liable for the wilful trespass of a servant. He is liable in an "action on the case" for an injury caused by the negligence or unskillfulness of a servant while doing his business, but not in an action of trespass vi et armis. But there is another ground to support that conclusion, to-wit, that a contractor is not a servant proper. His is an independent occupation, representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished. He is not subject to the orders of the other contracting party in respect to the details of the work, but is only bound to do the specific work according to an agreed plan. Baron Rolfe, in Reediev. R. R., 4 Exch., 244, said: "But neither the principle of the rule (of master and servant) nor the rule itself can apply to a case when the party sought to be charged does not stand in the character of employer to the party by whose negligent act the injury has been occasioned."
Hussey v. R. R., 98 N.C. 34, was an action for slander by defendant's general superintendent and came to this Court upon demurrer. This Court overruled the demurrer and sent the case back for such action as the defendant might be advised.
The first five prayers for instruction by the defendant were in substance that there was no evidence that the agent was acting in the line of his duty to his employer, or that if they believed the evidence they should answer the first issue "No." These prayers assumed the very question which the jury had to consider and that was properly left to the jury. The last prayer is answered in another part of this opinion.
We think the charge of the court presented the case to the jury fully as favorably as the defendant could ask. The exceptions (607) to the charge were that the court refused to give the prayers to the jury. We think the court gave the defendant's prayers, as far as was proper, to the jury, and the exceptions are overruled. Whilst the abusive language of the deceased would have justified his expulsion by necessary force, it could not extenuate such excessive violence on the part of the agent. *Page 419 
The burden of proving and making out a case, at least presumptively, was upon the plaintiff throughout the trial, but when the killing was admitted, then the burden of showing extenuating circumstances, by a preponderance of evidence, was upon the defendant. That was a material part of his defense, and the jury was so instructed. S. v. Willis, 63 N.C. 26; Joses v. R. R.,142 U.S. 17.
After mature consideration of this case, by reason of its importance, we are unable to see any error in the trial below.
Affirmed.
Cited: Tillett v. R. R., 118 N.C. 1046; Whitley v. R. R., 119 N.C. 727;Manning v. R. R., 122 N.C. 831; Williams v. Gill, ib., 969, 971;Whitley v. R. R., ib, 989; Strother v. R. R., 123 N.C. 198; Redditt v.Mfg., 124 N.C. 103; Lamb v. Littman, 128 N.C. 364; Lovick v. R. R.129 N.C. 433; Palmer v. R. R., 131 N.C. 251; Lyman v. R. R., 132 N.C. 725;Seawell v. R. R., ib., 859; Jackson v. Tel. Co., 139 N.C. 354; Pineusv. R. R., 140 N.C. 451; Sawyer v. R. R., 142 N.C. 6, 8; Hollingsworth v.Skelding, 142 N.C. 247; Stewart v. Lumber Co., 146 N.C. 66, 87; Jones v.R. R., 150 N.C. 480; Bullock v. R. R., 152 N.C. 67; Peanut Co. v. R. R.,155 N.C. 164; May v. Tel Co., 157 N.C. 421; Fleming v. Knitting Mills,161 N.C. 437; Wharton v. Ins. Co., 178 N.C. 439.