362 So.2d 288 (1978)
GOLD COAST PARKING, INC., and Insurance Company of North America, Appellants,
v.
David E. BROWNLOW and Marsha S. Brownlow, His Wife, Appellees.
No. 77-1608.
District Court of Appeal of Florida, Third District.
June 27, 1978.
Rehearing Denied October 6, 1978.
*289 Horton, Perse & Ginsberg and Mallory H. Horton, Dixon, Dixon, Lane & Mitchell, Miami, for appellants.
Headley & Sudduth, Goodwin, Ryskamp, Welcher & Carrier and Kenneth L. Ryskamp, Miami, for appellees.
Before BARKDULL and HUBBART, JJ., and PARKER, J. GWYNN (Ret.), Associate Judge.
BARKDULL, Judge.
Gold Coast Parking, Inc., and Insurance Company of North America, defendants in the trial court, appeal a final money judgment entered pursuant to a jury verdict.
Gold Coast is a corporation which owns and operates a parking lot in the City of Miami. Alfonso Fernandez is the manager of that lot and an employee of Gold Coast. Fernandez does not actually park cars or take the receipts; he is the supervisor in charge of those who do. One of the attendants employed by Fernandez was Sam Thomas, who was also an employee of Gold Coast. Thomas needed to be away on the day in question and was permitted by Fernandez to have Johnny Jenkins work in his place. Jenkins was not a Gold Coast employee and looked for payment from Thomas and not from Gold Coast. Jenkins was in complete charge of the lot and had permission from Thomas to drive Thomas' car. Jenkins had a helper with him at the lot to assist him; this helper was Alonzo Williams. Like Jenkins, Williams was not paid by Gold Coast or Fernandez; Williams was paid only by Jenkins. Jenkins was hungry and volunteered to buy lunch if Williams would go to pick it up. Williams agreed and Jenkins told him to use the Thomas vehicle to run the errand.[1] Williams was *290 also requested to pick up some tickets at another parking lot (not owned by Gold Coast), which Jenkins would use as he needed them. Williams also did a personal errand for Jenkins at this other parking lot. He then went on to pick up the lunch. While returning with the lunch, Williams ran down the appellee, Brownlow, an offduty policeman who was directing traffic around an obstruction.
Brownlow and his wife filed suit against Gold Coast and its insurer for vicarious liability for the negligence of Williams. The case came to be tried before a jury. At trial, the parties stipulated that Williams was guilty of negligence. At the conclusion of the case, the appellants moved for a directed verdict on the grounds that no vicarious liability had been proved. The trial court denied the motion and permitted the case to go to the jury. The jury returned a verdict in favor of the Brownlows.
The appellants contend that the trial court erred in refusing to grant the defendants' motion for directed verdict because, as a matter of law, there was no master/servant relationship between Gold Coast and Williams and, even assuming that there was, Williams was not acting within the course and scope of his duties when the accident occurred.
We affirm. The trial court did not err in failing to direct a verdict for the appellants on the question of Gold Coast's liability for Williams' negligent act since (a) Williams was a sub-agent of Gold Coast and was operating with the implied authority of Gold Coast at the time of the accident; and *291 (b) Williams was operating within the scope of his employment at the time of the accident.[1]
The facts of this case clearly establish that the "practice and custom" of using helpers was commonplace and that those helpers were, in fact, sub-agents of Gold Coast. See: Jacobi v. Claude Nolan, Inc., 122 So.2d 783 (Fla. 1st DCA 1960), wherein the following is found:
* * * * * *
"While we are inclined to agree with the defendant that the proofs did not establish the existence of an express contractual relationship of master and servant between these parties, this is not the only way that the relationship may be created. The relationship may arise by implication by the employment of a subservant by a servant to perform duties for the master, where the master has entrusted the servant with a task which cannot be performed by him within a reasonable time, where the business is of such a nature as to require the assistance of others, where there is an emergency, or where the authority to employ and use a subservant may be implied from the nature of the business or the course of trade. In these circumstances, the servant may employ a subservant to assist in the furtherance of the master's business, even though authority to hire the subservant has not been expressly given by the master. And under these conditions the master may be held liable for the tortious acts of the subservant, if they have been committed in the course of the employment. * *
* * * * * *
"That it was the general custom and practice of the Corporation for its salesmen to service complaints on automobiles sold by them, is indicated by the testimony of the salesman, Sanuta, who had been employed by the Corporation for a continuous period of six years prior to the accident. * * *
* * * * * *
"That the general practice and custom of using helpers was followed by the Corporation's salesmen in respect to contacts with their customers is indicated, we think by the testimony of Sanuta to the effect that in this manner and with the assistance of Pinkerton, the automobile sold to Mrs. Charett was delivered to her in the first instance. It is indicated by testimony of Mrs. Charett who testified that soon after she called the Corporation's place of business and requested Sanuta to come and get her car, Pinkerton appeared on the scene in a red Vauxhall and drove her car away. It is indicated by the fact that at the hearing on the motion the president of the Corporation produced records showing the ownership of a red Vauxhall  which records could have had no bearing on the issues, unless they related to the red Vauxhall left with Mrs. Charett by Pinkerton when he came to get her car. This evidence, and the testimony given by Mrs. Charett, concerning Pinkerton's activities, tends to prove, we think, that under the customs and usages of the business assistance by subservants was sanctioned by the Corporation; and that Pinkerton occupied such a position not only for the purpose of picking up cars in need of repairs but for a variety of other purposes as well."
* * * * * *
[emphasis supplied]
The question of "scope of employment" was a jury question and was properly resolved by the jury in this case. See: Stinson v. Prevatt, 84 Fla. 416, 94 So. 656 (1922), wherein the following is found:
* * * * * *
"It was for the jury to determine from the evidence whether Stinson shot plaintiff's decedent maliciously in pursuit of his own purpose or whether Stinson committed the wrongful act while acting in his capacity as agent of the defendant corporation to serve the interests of his employer, though the act was not authorized by his employer. In the first case the defendant company would not be liable, but in the latter case it would be.
* * * * * *

*292 "There is evidence to sustain a finding that the wrongful act of Stinson was committed while `acting in his capacity of agent of the corporation' though the particular act was not authorized; and, as it does not clearly appear that the act was maliciously done for Stinson's own purposes, the evidence is legally sufficient to sustain a general verdict of liability of the defendant company on the allegations of the declaration under the statute."
* * * * * *
See also: Columbia By the Sea, Inc. v. Petty, 157 So.2d 190 (Fla. 2d DCA 1963), wherein the following is found:
* * * * * *
"Upon consideration of all the testimony, the conflicting statements as to facts and the varying inferences and conclusions possible, it would seem the question was one best submitted to a jury. The trial judge submitted to the jury the question of whether or not the act committed by Menendez was done within the general scope of his authority. The jury determined this fact in favor of the appellee. We find that many cases, probably the weight of the authorities, have followed this course. Illustrative is the case of Daniel v. Petersburg R. Co., 117 N.C. 592, 23 S.E. 327, 4 L.R.A.,N.S. 485 where the Court said:
`* * * Was the agent's act in the course of his employment, and while about the master's business? No decisive test can be given, but in all cases the question whether the act was committed by the servant in the service of his employer, or for his own purpose is one for the jury, in view of all the circumstances. Wood, Mast. & S. 594; Hussey v. Railroad Co., 98 N.C. 34, 3 S.E. 923. In this case that question was submitted to the jury in the charge of the court, and by their verdict the fact that the agent was acting within the line of his employer's business is settled in the affirmative.'"
* * * * * *
Therefore, the judgment appealed herein is hereby affirmed.
Affirmed.
NOTES
[1] Sam Thomas, the senior employee, testified in part as follows:

* * * * * *
"Q [By Mr. Headley] When you were there on the lot, did you have the authority to get somebody or have somebody get your lunch or park cars for you and things of that nature, and pay him yourself?
"A Yes.
"Q Mr. Fernandez knew about that, did he not?
"A Yes.
* * * * * *
"Q If you had a lot of cars come in at one time, you might get one of your friends or somebody to help you out; is that right?
"A Yes.
"Q That would be something that would be up to you, would it not?
"A Yes.
"Q You did not go to Mr. Fernandez each time that happened and ask if you could hire someone for an hour or two, did you?
"A No.
"Q Who paid these people?
"A Usually I would pay them.
* * * * * *
"Q Prior to this accident coming up, this case coming up, did anybody ever object, including Fernandez, to you all getting food anywhere you wanted to?
"A No.
"Q As a matter of fact, you got Kentucky Fried Chicken many times, did you not?
"A Yes.
* * * * * *
"Q [By Mr. Headley] Alonzo Williams worked for other people on the lot from time to time?
"A Yes.
"Q Was he sent, to your knowledge, to get fried chicken for other people?
"A. Yes.
"Q Did he use your car to run errands for the lot?
"A Yes.
"Q That was all with Fernandez' knowledge, was it not?
"A Yes, it was."
Alonzo Williams, who worked at the parking lot on previous occasions, testified:
"Q [By Mr. Headley] In your previous times working on the lot, what was the custom and practice for getting food when the lot was busy?
"A Well usually one of the guys would stay and the other would go get it. If somebody was on the lot that they knew, they would either send them or tell them to watch the lot until they go across the street and pick it up, or whatever.
"Q So the lot would not be left unmanned and possibly cause loss to Gold Coast Parking; is that right?
"A Yes, that's the problem.
* * * * * *
"Q Mr. Williams, when you had worked on the lot before, was it customary to go down to the Kentucky Fried Chicken to get chicken?
"A Yes.
"MR. DIXON: I object. That is, what is customary is part of the test of what the issue is here.
"THE COURT: Overruled.
Go ahead.
"Q [By Mr. Headley] Had anyone ever complained about it before?
"No.
"Q Until this accident happened, is that right?
"A That's right."
Alfonso Fernandez, manager of the parking lot, testified in part as follows:
* * * * * *
"Q Did you understand that from time to time the men who were working the shift there would have to leave to go to the bathroom or perhaps to go across the street to get something to eat or something like this?
"A Yes, sir.
"Q Was that permissible with you as long as 
"A As long as it don't take too long, yes, of course.
* * * * * *
"Q You were aware, were you not, that if a man did have to go while handling the business and have to go to the bathroom, that that lot was left in an empty state?
"A Unattended, yes.
"Q And that if that man could get somebody to take his place for the time being you certainly approved of that, did you not?
"A Yes, sir."
* * * * * *