COMMONWEALTH *vs.* JESSE J. COBURN & another.

Worcester. Oct. 7, 1881. — May 4, 1882. LORD, W. ALLEN & C. ALLEN, JJ., absent.

On an indictment, under the Gen. Sts. *c.* 160, § 34, against a carrier of passengers, to recover the penalty therein provided in case the life of a passenger is lost through the negligence of the carrier or that of his servants, the defendant is not entitled to a ruling that, if the loss of life was caused by the improper conduct of third persons, and the accident would not have happened without such improper conduct, the defendant cannot be convicted, although it may not appear that the defendant or his servants did all that could be done to restrain such improper conduct.

An indictment, under the Gen. Sts. *c.* 160, § 34, against a carrier of passengers on a steamboat, to recover the penalty therein provided for the loss of the life of a

passenger, alleged that by the negligence of the defendant the boat was permitted to be defective and unsafe, and furnished with a hurricane deck which endangered the safety of said boat and of passengers thereon; and that by the negligence of the defendant said deck was suffered to be and was overloaded with passengers, and an undue number of passengers, in view of the whole number on the boat, was allowed to go, be and remain on said hurricane deck, by reason of which said deck was torn off and a certain passenger killed. The evidence tended to show that the deck when fully loaded was insufficiently built and unsafe, and that the accident was caused by a crowd coming on board, without proper restraint, from the wharf at which the boat was lying at the time. *Held*, that it was not necessary to allege in the indictment the evidence which tended to support the charge of negligence, or to allege the specific acts the neglect to do which constituted the negligence alleged.

INDICTMENT, under the Gen. Sts. *c.* 160, § 34, in two counts. The second count, upon which alone the case was submitted to the jury, was as follows:

" And the jurors for the Commonwealth aforesaid on their oath aforesaid do further present, that Jesse J. Coburn and Jehiel C. Coburn, both of Worcester in said county, on the fourth day of July in the year eighteen hundred and seventy-nine, at Worcester in said county, were the proprietors of a certain steamboat employed by the said Jesse J. Coburn and the said Jehiel C. Coburn for the conveyance of passengers for hire from a certain place called and known as Lincoln Park, situate in said Worcester on the west side of Lake Quinsigamond, so called, said Lake Quinsigamond being a body of water within this Commonwealth and not within the maritime jurisdiction of the United States of America, upon and over said lake to a point on the easterly side of said lake, called and known as Quinsigamond Park, in Shrewsbury in said county, and were common carriers of passengers for hire on and over said lake on and by the route aforesaid, and, being such proprietors and common carriers of passengers, did, on said fourth day of July at said Worcester, as and while said steamboat was lying at her landing at said place called and known as Lincoln Park, and was then and there receiving and had received on board of her the passengers for the trip of said steamboat, then about, and soon, to commence on and over said lake, conduct, operate, manage and control said steamboat, on board of which said steamboat one Patrick Cahill was then and there a passenger for hire; and said Jesse J. and said Jehiel C. then and there had the custody, care and management

of said steamboat, and, by the negligence and carelessness of said Jesse J. and said Jehiel C., said steamboat was then and there suffered to be and was defective and unsafe, and furnished with a hurricane deck, which endangered the safety of said steamboat and of passengers riding thereon; and said hurricane deck of said steamboat, by the negligence and carelessness of said Jesse J. and said Jehiel C., was then and there suffered to be, and was improperly, overcrowded and overloaded with passengers, and by the negligence and carelessness of the said Jesse J. and the said Jehiel C. an undue and disproportionate number of passengers, in view of and as compared with the whole number of passengers then and there on board said steamboat, was then and there suffered to go, be and remain on said hurricane deck; and, by the negligence and carelessness of said Jesse J. and said Jehiel C., said steamboat then and there was, and was suffered to be, overloaded with passengers, by means and reason of all which said hurricane deck was then and there broken and torn off from said steamboat, and precipitated into the water, and said steamboat was then and there violently rocked and thrown over upon one side of her, whereby said Patrick Cahill was then and there violently thrown out of said steamboat into said lake, and was then and there choked, suffocated and drowned with the water thereof, of which said choking, suffocating and drowning said Patrick Cahill then and there instantly died; and so the jurors aforesaid on their oath aforesaid do say that the life of the said Patrick Cahill, being a passenger as aforesaid, was then and there lost by reason of the negligence and carelessness of said Jesse J. and said Jehiel C. in manner and form aforesaid, whereby said Jesse J. and said Jehiel C. have become liable to a fine, not exceeding five thousand dollars nor less than five hundred dollars, to be recovered by indictment and paid to the executor or administrator of said deceased person for the use of the widow and children of said deceased person in equal moieties, but if there are no children of said deceased, then to the use of the widow of said deceased, and if there is no widow of said deceased, to the use of the next of kin of said deceased; that Bridget Cahill of said Worcester has been duly appointed and now is the administratrix of said Patrick Cahill deceased, and of his goods and estate; and said Bridget Cahill is the widow of said

deceased person; that there are three children of said Patrick Cahill deceased now living, namely, Mary A. Cahill, Lena Cahill and Agnes T. Cahill."

Trial in the Superior Court, before *Pitman*, J., who allowed a bill of exceptions in substance as follows:

It appeared in evidence that, in the summer of 1879, there was a pleasure steamer plying on Lake Quinsigamond in Worcester, called the Isaac Davis, which made trips around the lake starting from and returning to Lincoln Park so called, which park was owned by the defendant Jesse J., and was the terminus of the Worcester and Shrewsbury Railroad running from Worcester; that, on July 4, 1879, a large number of pleasure-seekers being upon said boat while she was moored at the wharf at Lincoln Park, preparatory to one of her trips, her hurricane deck broke and slid off, precipitating many persons into the water, among whom was Cahill, who was drowned; that on July 3, 1879, the defendant Jesse J., anticipating a crowd at the lake and Lincoln Park on the succeeding day, applied to the mayor of Worcester for a detail of police to attend at said park, which was in Worcester, which detail was promised by the mayor, and the city marshal was ordered by him to send the same, but no detail was furnished by the marshal and no police officers were there on July 4 until after the accident, which occurred between one and two o'clock P. M.

It also appeared that the boat was licensed under the St. of 1876, c. 100, after an inspection of the same by the mayor and city engineer of Worcester, pursuant to a vote of the mayor and aldermen, and that by her license she was permitted to carry one hundred and seventy-five passengers; but that the license was never posted up as required by statute; and that the defendant had advertised both before and after the accident, in the daily papers of the city of Worcester, that the steamer would carry three hundred passengers.

There was evidence for the government tending to show, among other things, that the boat was defective in its construction, in that the upper deck was insufficiently supported and braced, and too lightly built, and built of such an area and at such a height that, when filled with persons to its full capacity, or nearly to its full capacity, it was top-heavy and unsafe; that

the boat had come in from a trip over the lake; that there were many people at the landing, on the arrival, waiting to go on her on her next trip down the lake; that this company was composed of men, women and children, and was a good-natured holiday crowd; that the passengers who arrived at the wharf disembarked with no greater difficulty than would be usual in such a collection of people; that the crowd upon the wharf hastened on board at the same time, eager to secure seats, but not uncontrollably; that the greater part of the persons who boarded the steamer went directly to the hurricane deck; that the boat began to rock, and, after a lurch or two, her guard struck over the wharf, and she canted outward, when her hurricane deck gave way and the passengers were precipitated into the lake.

The evidence of the government further tended to show that there was no fence, gate, or other barrier to keep the people from going on to the boat at any point on the wharf, excepting the railing of the boat itself; that some of the band, who were free passengers, on the wharf were invited by the purser or conductor of the steamboat to go over the railing of the boat, and they did so, and several others followed without invitation; that no orders were given by anybody to the people on the wharf about entering on the boat, except to stand back and let the people who were on the boat get off, which order the people obeyed; that no statement was made to the company assembled there that there was any danger to anybody from going on to the boat; and no orders given not to go on the hurricane deck; that the captain of the boat informed the people that there was plenty of room on the boat; and continued to help people on to the boat up to a very short time before the accident; that among others he helped the family of Cahill on, and they with Cahill took seats on the lower deck, where they remained till the accident happened.

The evidence for the defence tended to show that the boat was well built, and was strong enough and safe to carry the number of passengers for which she was licensed; that, when the boat came to the wharf, there was a great crowd, five hundred or six hundred people, standing at the landing; that as soon as the boat struck the wharf the crowd began to rush aboard, going through the gangway, over the rail and over the wheel-house,

regardless of the struggles of the passengers on board to disembark; that the captain of the boat, the engineer, and two deck hands, who constituted the crew, unavailingly ordered the crowd to fall back until the passengers who had arrived were off the boat, and endeavored to hold the crowd in check by commands and personal efforts, but were overpowered by the crowd; that the defendant Jesse J., who had come to the wharf as the boat approached, observing the movements of the crowd, ordered them back from the wharf, and said that persons coming on must show their tickets at the gangway; and, finding his efforts unavailing, jumped upon the boat, went to the companion-way leading to the hurricane deck, and there unsuccessfully ordered the crowd back and tried to prevent any more from going on that deck; that both he and the captain of the boat publicly declared that the crowd must preserve order and show their tickets at the gangway, and that the boat should not leave the wharf until some of those already on board and on the hurricane deck had gone ashore; that in this condition of things, and when the hurricane deck was greatly overcrowded, the accident happened; that with the force at hand the defendant Jesse J. could not control the persons rushing on board; that, up to this time of the day, there had been no crowd at the park, and no difficulty in loading and unloading the boat. The defendant Jesse J. testified that he had not expected the crowd till afternoon, and expected the police to arrive on every train by the Worcester and Shrewsbury Railroad, which ran half-hourly, and certainly upon the train which would leave Worcester at half past one o'clock, and which had arrived at the park five minutes before the accident, bringing a great accession to the crowd, but no police. The captain of the boat also testified that when he arrived at the park, about nine A. M., he asked the defendant, "Where are the police?" to which defendant replied, "I expect them on the next train," and that the witness added, "It is a very important matter, as we expect a large crowd here."

The defendants submitted five requests for instructions, the following only being those which need now be stated: "4. If the breaking down of the upper deck of the boat and the loss of the life of Cahill were caused by the improper conduct of the crowd in haste to board the boat and secure accommodations thereon;

and, without such improper conduct, the accident would not have happened, the defendants cannot be convicted, although it may not appear that the defendants, or their servants or agents, did all that could be done by way of caution or command, or otherwise, to restrain the crowd. 5. The only negligence alleged in the indictment as causing this disaster is in having a boat defective, and a hurricane deck improperly supported and of improper height, and that the owners or their servants overcrowded the same and allowed a disproportionate number of persons to remain on said hurricane deck; and, as it is not alleged that the defendants or their servants failed to take proper measures to restrain or control the crowd at the wharf, they cannot be convicted if the jury find that the accident was caused by the conduct of the crowd, and by the failure to restrain it."

The judge refused so to rule, and instructed the jury as follows: " The defendants are to be tried on the allegations in the indictment alone. A carrier of passengers for hire is not held to take every possible precaution against danger, for this might oblige him to adopt a course of conduct inconsistent with the economy and speed essential to the proper despatch of his business; but he is bound to use the utmost care which is consistent with the nature and extent of the business in which he is engaged, in the providing of safe, sufficient and suitable vehicles, in the management and equipment of the same, and in making such reasonable arrangements as a prudent man would make to guard against all dangers, from whatsoever source arising, which may naturally and according to the usual course of things be expected to occur. The want of due care which must be shown, to constitute the carelessness referred to in the statute, and to authorize a conviction under this indictment, must be a substantial neglect of some duty thus appertaining to a carrier of passengers.

" In further illustration and exemplification of the duties of passenger carriers, as applied to this case, I instruct you that the owner of this boat was bound to use the utmost care and diligence, with the qualification and limitation before stated, in keeping this steamboat in a safe condition, and provided with sufficient and competent officers and crew, and in making all the arrangements necessary to secure the passengers against all damages which might reasonably be anticipated, not only from the

action of the elements, but from that of passengers or other persons. If the carrier fails in his duty, he is responsible for his negligence, although the negligence or misconduct of a third party contributes to the injury. He is not responsible for the negligent or wrongful acts of the passengers or other persons to the same extent as for those of his own officers and crew; but a carrier has the power to make reasonable regulations as to the entrance and departure of persons, as to the places which passengers must occupy, and as to their conduct while on board, and he is bound to use the utmost skill and care (as before explained) of prudent men, in taking precautions to prevent any passenger being injured by the ignorant, negligent or reckless acts of other passengers. He is not bound to anticipate or provide for sudden and extraordinary occurrences which he could not have foreseen, but he is bound to guard against the results of the action of third parties which he should reasonably have anticipated, and his duty is not only one of reasonable care and preparation and foresight, but when danger has actually arisen he is bound to use skill, energy and promptness proportioned to the emergency."

The jury returned a verdict of guilty as to Jesse J. alone; and he alleged exceptions to the instruction given, and to the refusal to rule as requested.

*W. S. B. Hopkins*, for the defendant.

*F. P. Goulding*, (*M. J. McCafferty* with him,) for the Commonwealth.

FIELD, J. At the argument in this court the counsel for the defendant relied only upon his exceptions to the refusal of the justice presiding at the trial to give the fourth and fifth requests for instructions, and to the instructions given instead thereof.

The fourth request for instructions assumes that the improper conduct of third persons contributing to the injury would excuse the defendant, even although the defendant neglected to perform his duty, and it was properly refused. The fifth request for instructions does not correctly state the allegations of negligence contained in the indictment, or the law applicable to the case, and was also properly refused. The negligence and carelessness alleged in the indictment are in permitting the boat to be defective and unsafe, and in furnishing it with a dangerous hurricane

deck and in permitting too many passengers " to go, be and remain on said hurricane deck." It was not necessary to allege that the defendants failed to take proper measures to restrain or control the crowd at the wharf. So long as the crowd confined itself to the wharf, it contributed nothing to the injury. It was the crowd on the hurricane deck that occasioned the injury; and the jury must have found that the defendant was negligent in permitting this crowd " to go, be and remain " upon a hurricane deck constructed as that was upon such a steamboat. It would not have been good pleading to set out in the indictment the evidence which tended to support this charge of negligence, and it was not necessary to allege the specific acts the neglect to do which constituted this negligence, because the negligence did not consist in the omission to do any particular act or acts. The duty was a general one to prevent by all reasonable and proper means the dangerous overcrowding of the hurricane deck, and a neglect to perform this duty was the negligence charged. *Commonwealth* v. *Boston & Worcester Railroad,* 11 Cush. 512.

The instructions given were in accordance with the opinion in *Simmons* v. *New Bedford, Vineyard & Nantucket Steamboat Co.* 97 Mass. 361, and were appropriate and sufficient.

*Exceptions overruled.*