WILLIAM C. DODGE *vs.* BOSTON AND BANGOR STEAMSHIP
COMPANY.

Essex.   November 8, 1888. — January 2, 1889.

Present: MORTON, C. J., FIELD, DEVENS, C. ALLEN, & KNOWLTON, JJ.

*Common Carrier — Passenger — Intermediate Station — Negligence.*

A common carrier by water, whose boats usually started from one end of its route
late in the afternoon and reached the first stopping place early the next morn-
ing, meals being furnished to such as paid extra or had tickets including them,
sold a ticket to a passenger for a passage without meals to a point beyond that
place. Egress to the wharf at this place, where the average stop was about
an hour, was had from the forward part of the boat's main deck through a slip
adjustable to the state of the tide. The owner of the wharf, who leased a part
of it together with certain rights of way to the carrier, maintained upon it a
restaurant, at which passengers bound for points beyond were in the practice
of obtaining breakfast, with the knowledge of the carrier and without objection
on his part. *Held*, that such a passenger could properly go ashore to get his
breakfast at the restaurant, and was entitled to all the rights of a passenger in
leaving the boat, and in passing over the slip if that was a proper place for the
exit of passengers.

The carrier at that place provided a safe and convenient place for passengers to
land from the saloon deck, and intended the forward part of the main deck and
the slip exclusively for the discharge and receiving of freight and baggage.
Such passenger attempted to land from the main deck, and was injured while he
was on the slip. At the trial of an action against the carrier to recover for such
injuries, there was evidence warranting a finding that the plaintiff was notified
that passengers were to land from the saloon deck only, and that subsequently
he was warned by an officer of the boat not to leave it from the main deck and
through the slip. *Held*, that a refusal to instruct the jury that he could not
recover, if he received such notice and warning, unless the injury was wilfully
inflicted, gave the carrier good ground of exception.

TORT for personal injuries occasioned to the plaintiff while
going ashore from one of the defendant's steamboats. Trial in
the Superior Court, before *Blodgett*, J., who, after a verdict for
the plaintiff, allowed a bill of exceptions, which, so far as mate-
rial, was as follows.

The following facts were undisputed. The defendant was, in
1887, a common carrier of freight and passengers by water,
owning a line of steamboats plying between Boston and Bangor,
Maine, stopping at intermediate places on the Penobscot Bay
and River. The defendant's steamboats usually left Boston at

about five o'clock in the afternoon, and arrived at Rockland, Maine, the first stopping place, about five or six o'clock on the following morning. The boats usually stopped about an hour at Rockland for the discharging and receiving of passengers, baggage, and freight, and then proceeded up the bay to Camden, the next stopping place. Meals were regularly served upon the steamboats of the line, during each trip, to those passengers who had bought tickets entitling them to meals, or to such as chose to pay extra for them beyond the fare for a passage alone.

On August 22, 1887, the steamboat Lewiston left Boston at the usual time, having on board the plaintiff, who had purchased a ticket for a passage, without meals, from Boston to Camden, and reached her wharf at Rockland at 7.45 o'clock on the following morning, where she remained about forty minutes, unloading and receiving freight and passengers with their baggage. The defendant leased a portion of a wharf at Rockland for the landing and receiving of passengers and freight, as well as certain rights of way over the wharf. The owner of this wharf maintained a restaurant on it, against the wishes and interest of the defendant, and for some time before August 23, 1887, a practice had prevailed among passengers on the defendant's steamboats, bound for places beyond Rockland, of breakfasting at this restaurant, with the knowledge of the defendant's servants, who made no objection to the same.

Of the four decks of the Lewiston, the main deck, or deck of the hull, was devoted to the storage of freight and baggage, as well as to the use of passengers, while the saloon deck, or deck next above the main deck, carried most of the state rooms, and was devoted almost exclusively to the use of passengers. The forward portion of the main deck, called the freight-room, was partitioned off from the rest of the deck, and was used for the storage of baggage and freight, passageways leading into and through it from the after portion of the deck which was intended for the use of passengers, which passageways the defendant was compelled to keep open and unobstructed. Freight and baggage were received and discharged through gangways opening out from the freight-room through the sides of the forward portion of the boat. At the wharf at Rockland egress was

had from the freight-room on the main deck by means of a slip or section of the wharf, forty-two feet long and nine feet wide, which was hung upon hinges at its inner end, and could be raised and lowered in a recess in the wharf, according to the state of the tide, so that its outer end might always be on a level with the main deck while a boat was lying at the wharf. On the arrival of a boat at Rockland, it was the custom first to run out a narrow plank, about two feet wide and without side rails or cleats, through one of the gangways opening out of the freight-room on to this slip, which had been lowered to the proper level. The deck hands thereupon passed over this plank on to the slip, and thence to the wharf, for the purpose of getting a gang plank and placing it in position between the wharf and the boat, so as to overlap a part of the slip and the main deck at the gangway. This gang plank was seventeen feet long and six feet wide, was provided with rails at either side, and was handled by means of ropes attached to each corner.

On the arrival of the Lewiston at Rockland, the plaintiff, who had purchased his supper on the boat the night before, was standing on the forward part of the saloon deck while the boat was being made fast to the wharf. The small plank had been run out from the gangway on the main deck on to the slip, and the deck hands had passed ashore over it to get the gang plank. The plaintiff thereupon, for the purpose of obtaining his breakfast at the restaurant on the wharf, went down from the saloon deck to the main deck, and, passing through the freight-room, walked across the small plank on to the slip, the outer end of which on that morning was about six feet below the general level of the wharf. He had proceeded about two thirds of the way up the slip, when he was met by the deck hands returning with the gang plank. The plaintiff stepped upon the plank, as it was in motion, and in crossing it diagonally one of his feet was caught between the plank and the side of the slip, and was injured.

The defendant introduced evidence tending to show that no provision had ever been made or practice adopted by the defendant for discharging or receiving passengers at Rockland from or upon the main deck, although occasionally passengers had been landed there from that deck; that when the Lewiston arrived at Rockland on August 23, and after she had been made

fast to the wharf, a passenger plank, with railings on either side and with cleats crosswise of its flooring, was run out from the forward part of the saloon deck to the wharf, and was secured by ropes to ringbolts in the deck; that during the stop at Rockland the captain of the boat and the purser stood on that deck, at the head of this plank, to assist outgoing and incoming passengers, and to collect tickets. The defendant also introduced evidence that, before reaching Rockland, a servant of the defendant went into every part of the boat where passengers were expected to be, including the forward part of the saloon deck, at a time when the plaintiff was there, alternately ringing a loud-sounding bell, and calling: "Rockland. Passengers will land from the saloon deck, forward gangway, left-hand side." The plaintiff and others testified that they heard no such notice given.

The defendant further introduced evidence tending to show that, just before the plaintiff stepped upon the small plank leading to the slip from the main deck, he was warned by one Harrigan, the second mate of the boat, who was stationed near the gangway, not to go out over the plank to the wharf; but the plaintiff denied that he had received any such warning. No claim was made at the trial that the plaintiff's injuries were wilfully inflicted.

At the close of the evidence, the defendant asked the judge to give the following instructions:

"1. The defendant was not bound to take every possible precaution against danger; it was not an insurer of the safety of the plaintiff, it was bound to use the utmost care which was consistent with the nature and extent of the business in which it was engaged, but was bound to exercise this degree of care toward the plaintiff only so long as the plaintiff remained upon or within the steamer.

"2. The defendant was bound to guard the plaintiff against all such dangers only as might naturally, and according to the usual course of things, be expected to occur; and this, too, only as long as the plaintiff remained upon or within the steamer.

"3. Upon the undisputed facts of this case, the plaintiff, at the time of receiving the injury of which he complains, was not a passenger; he was entitled to the rights and protection of a passenger only so long as he remained within or upon the steamer.

" 4. Upon the undisputed facts of this case, the undertaking and duty of the defendant toward the plaintiff was to carry him with the highest degree of care from Boston to Camden, and only at Camden to provide him safe means to leave the steamer.

" 5. Defendant was not bound to prevent plaintiff from leaving, or attempting to leave, the steamer at a place where it had not invited him to leave, or undertaken any contract to land him.

" 6. If the jury find that the plaintiff undertook, for his own convenience or pleasure, to leave the steamer at Rockland, an intermediate station on the trip for which he had purchased his ticket, while the steamer was temporarily at said Rockland for the purpose of discharging and receiving other passengers, baggage, and freight at said Rockland, and without notice to any of the officers or servants of the defendant that he desired to leave the steamer at that point, and without any invitation from the officers or servants of defendant to leave the steamer at said point, at the time and in the manner in which he left the steamer, then the defendant was under no obligation to furnish the plaintiff with safe means of egress from the steamer at that point.

" 7. If the jury shall find that the plaintiff left the defendant's steamer at a point short of his destination, without any invitation or inducement from the defendant, or its agents or servants, and solely for his own purposes and convenience, he was, after leaving the steamer, a mere trespasser upon the defendant's landing and wharf, and the only obligation upon the defendant was not to wilfully injure him.

" 8. If the jury shall find that the plaintiff was warned by the agents or servants of the defendant not to leave the steamer at the forward port gangway on the main deck at or before the time at which he left it, the plaintiff must be held to have taken all the risk of injury upon himself in leaving at the time and in the manner in which, and from the portion of the steamer at which, he left the steamer, and cannot recover from the defendant for any injury which he may have sustained while so leaving, unless such injury was wilfully inflicted.

" 9. If the jury shall find that the plaintiff was notified by the agents or servants of the defendant, at or before the time at which

he left the steamer, that passengers desiring to land at Rockland were to land at or from a part of said steamer other than the forward port gangway on the main deck, from which the plaintiff did actually land, the plaintiff must be held to have taken all the risk of injury himself in leaving the steamer at the time and in the manner in which, and portion of the steamer at which, he left the steamer, and cannot recover from the defendant for any injury which he may have sustained while so leaving, unless such injury was wilfully inflicted."

The defendant further requested the judge, in case of a refusal to give the instruction marked No. 6, to instruct the jury as follows:

" 10. Even if the plaintiff was justified in leaving the steamer at Rockland in the manner and at the time and in the portion of the steamer at which he left it, the defendant did not owe him so high a degree of care after he had left the steamer and was out upon the slip, as it owed him while he remained upon or within the steamer."

The judge refused to give the instructions prayed for, and instructed the jury, among other things not material, as follows:

" It is an important question whether the plaintiff, as matter of law, is entitled to maintain this action upon the ground that, at the time when he was injured, this corporation owed him any duty, and therefore was guilty of any carelessness or negligence. But for the purposes of this trial, and in view of the uncontroverted facts in the case, — some of which are the ordinary length of time that the boat should stop at Rockland, the time when the boat arrived at Rockland that morning, the time when the plaintiff took passage, the practice known to the defendant, and which the plaintiff says was known to him, of passengers to some extent to leave the boat at Rockland for the purpose of getting breakfast, the number of passengers upon the boat, and the fact that the plaintiff's ticket did not entitle him to a breakfast upon the boat, — I will instruct you, as requested by the plaintiff, and you are to take that to be the undoubted rule of law applicable to this case, that the plaintiff was not bound to take his breakfast on the boat, and, using due care, had the right to go ashore for food, and during his egress from the boat the defendant and its servants were bound to exercise reasonable care to

protect him from injury; and that is the question you will be called upon to consider.

"The plaintiff says that the defendant was negligent. . . . Did the defendant fail to furnish reasonable means of egress from the steamer Lewiston upon its arrival at Rockland on the morning of August 23? The plaintiff does not now claim that the defendant did not furnish proper means of egress from the saloon deck, nor do I understand that the plaintiff now claims that the defendant intended the gangway which was in fact used by the plaintiff for use by passengers leaving the boat; but the plaintiff says that the defendant was negligent in several respects. He says that it was the duty of the defendant to give him reasonable notice where he should leave the boat, and how he was to leave the boat, and he says that no notice was given which was brought to his attention. On the other hand, the defendant calls witnesses who tell you that notice was given that morning that passengers intending to land at Rockland would land from the saloon deck, and the plaintiff says that, as the boat approached Rockland, he was upon the saloon deck, but he says he heard no such notice, and witnesses called by him say they heard no such notice. Now, you will inquire whether this notice was given. If given, you will inquire whether the defendant did or did not do all it was called upon to do as to this particular matter. The defendant was called upon to give notice which would be sufficient for a man of ordinary intelligence, who was attentive, intending to avoid any danger to which he might be exposed, and who was using his senses at the time for the purpose of acquiring the information of which he stood in need. The fact that the plaintiff did not hear the notice is not decisive one way or the other. . . .

"Unless the plaintiff satisfies you that there was some negligence on the part of the defendant, — and that, of course, you understand to be nothing other than the failure to use reasonable care to enable the plaintiff to leave this boat in safety at Rockland, — you have no occasion to go further; but suppose you come to the conclusion that the plaintiff has shown, by a fair preponderance of the evidence in the case, carelessness on the part of this defendant corporation, still the plaintiff must go further, and satisfy you upon all the evidence in the case that

there was no failure on his part to use reasonable care for his own protection. . . . Now, in several respects the defendant says that the plaintiff was careless. . . . The contention of the defendant is, that the plaintiff was careless in attempting to leave the boat at this place, because the defendant says that the appearance of things brought to the notice of the plaintiff as he attempted to leave upon the main deck was such as to notify him that that was not intended as a place of exit for passengers, but was intended for the discharge and receipt of freight and baggage. . . . Then, further, the defendant says that the plaintiff, had he been attentive, using his senses, must have heard the notice that passengers were to leave the boat from the saloon deck; and the defendant says, further than that, he was warned by Harrigan, the second mate, just before he attempted to pass out at this place. . . . You will . . . say, upon all the evidence in the case, whether the two things are proved, — the negligence on the part of the defendant, and due care on the part of the plaintiff."

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

*E. T. Burley & E. S. Dodge,* for the defendant.

*W. H. Moody*, for the plaintiff.

KNOWLTON, J.  This case presents an important question as to the rights and duties of passengers and common carriers in reference to egress from and ingress to the vehicle of transportation at intermediate points upon a journey.  When one has made a contract for passage upon a vehicle of a common carrier, and has presented himself at the proper place to be transported, his right to care and protection begins, and ordinarily it continues until he has arrived at his destination, and reached the point where the carrier is accustomed to receive and discharge passengers.  So long as he stands strictly in this relation of a passenger, the carrier is held to the highest degree of care for his safety.  While he is upon the premises of the carrier, before he has reached the place designed for use by passengers waiting to be carried, or put himself in readiness for the performance of the contract, the carrier owes him the duty of ordinary care, as he is a person rightfully there by invitation.  It has sometimes been said that a passenger at the end of his jour-

ney retains the same relation to the carrier until he has left the carrier's premises.   But there are other cases which indicate that the contract of carriage is performed when the passenger at the end of his journey has reached a safe and proper place, where persons seeking to become passengers are regularly received, and passengers are regularly discharged, and that the degree of care to which he is then entitled is less than during the continuance of his contract, as a carrier of goods is held to a liability less strict after they have reached their destination and been put in a freight-house than while they are in transit.

There is sometimes occasion to leave the boat, or car, or carriage, and return to it again before the contract is fully performed; and it is necessary to determine what are the rights and duties of the parties at such a time.   Whenever performance of the contract in a usual and proper way necessarily involves leaving a vehicle and returning to it, a passenger is entitled to protection as such, as well while so leaving and returning as at any other time; and this has been held in cases, where, in accordance with arrangements of the railroad companies, passengers by railway left their train to obtain refreshments.   *Peniston* v. *Chicago, St. Louis, & New Orleans Railroad*, 34 La. An. 777.   *Jeffersonville, Madison, & Indianapolis Railroad* v. *Riley*, 39 Ind. 568.   So where a railroad company undertakes to carry a passenger a long distance upon its line, and sells him a ticket upon which he may stop at intermediate stations, in getting on and off the train at any station where he chooses to stop he has the rights of a passenger.   Of course, during the interval between his departure from the station and his return to it to resume his journey he is not a passenger.

To determine the rights of the parties in every case, the question to be answered is, What shall they be deemed to have contemplated by their contract?   The passenger, without losing his rights while he is in those places to which the carrier's care should extend, may do whatever is naturally and ordinarily incidental to his passage.   If there are telegraph offices at stations along a railroad, and the carrier furnishes in its cars blanks upon which to write telegraphic messages, and stops its trains at stations long enough to enable passengers conveniently to send such messages, a purchaser of a ticket over the railroad has a

right to suppose that his contract permits him to leave his car at a station for the purpose of sending a telegraphic message; and he has the rights of a passenger while alighting from the train for that purpose, and while getting upon it to resume his journey.  So of one who leaves a train to obtain refreshment, where it is reasonable and proper for him so to do, and is consistent with the safe continuance of his journey in a usual way. Where one engages transportation for himself by a conveyance which stops from time to time along his route, it may well be implied, in the absence of anything to the contrary, that he has permission to alight for his own convenience at any regular stopping place for passengers, so long as he properly regards all the carrier's rules and regulations, and provided that his doing so does not interfere with the carrier in the performance of his duties.

In the case of *Keokuk Northern Line Packet Co.* v. *True*, 88 Ill. 608, a plaintiff before reaching his destination was going ashore for his own convenience at a place where the boat stopped two hours, and was injured on the gangway plank.  It was held that he was to be treated as a passenger, and that the defendant was bound to use the utmost care for his safety.  See also *Clussman* v. *Long Island Railroad*, 9 Hun, 618, affirmed in 73 N. Y. 606; *Hrebrik* v. *Carr*, 29 Fed. Rep. 298; *Dice* v. *Willamette Transportation & Locks Co.* 8 Oregon, 60.  In the first of these cases, the defendant was held liable, for a defect in a platform of its station, to a passenger who had left a train to send a telegraphic message; but the court did not decide whether the plaintiff had the rights of a passenger at the time of his injury, or merely those of a person there by invitation.  In the second, a passenger who had taken his place on board a steamship started to go on shore to buy some tobacco, and fell from an unsafe plank and was drowned.  He was held to have had the rights of a passenger, and his administrator was permitted to recover.

No decision has been cited that conflicts with our views.  In *State* v. *Grand Trunk Railway*, 58 Maine, 176, the circumstances under which the passenger left the train and remained away from it were such that, applying the principles we have enunciated, he was not a passenger at the time he was killed.  The court in that case was not called upon to consider at what point

a passenger leaving a car under different circumstances would cease to be such, and at what point he would resume his former relation.

Upon the undisputed facts of the case at bar, we are of opinion that the plaintiff as a passenger could properly go on shore to get his breakfast at Rockland, and that he had a passenger's right to protection during his egress from the steamer. The first seven of the defendant's requests for instructions were rightly refused.

The defendant's tenth request was for an instruction that, if the plaintiff was justified in leaving the steamer as he did, the "defendant did not owe him so high a degree of care after he had left the steamer and was out upon the slip, as it owed him while he remained upon or within the steamer." This request referred to the degree of care which the law requires of carriers of passengers, as distinguished from the ordinary care required of men in their common relations to each other. Because a passenger's life and safety are necessarily intrusted in a great degree to the care of the carrier who transports him, the law deems it reasonable that the carrier should be bound to exercise the utmost care and diligence in providing against those injuries which human care and foresight can guard against. This rule is held not only in our own State and in England, but all over the United States. It applies not only to carriers who use steam railroads, but to those who use horse railroads, stagecoaches, steamboats, and sailing vessels. It applies at all times when, and in all places where, the parties are in the relation to each other of passenger and carrier; and it includes attention to all matters which pertain to the business of carrying the passenger.

In *Readhead* v. *Midland Railway*, L. R. 2 Q. B. 412, it is said that a "carrier of passengers for hire was bound to use the utmost care, skill, and diligence, in everything that concerned the safety of passengers." In *Railroad Co.* v. *Aspell*, 23 Penn. St. 147, carriers of passengers are said to be responsible for "any species of negligence, however slight, which they or their agents may be guilty of." In *Warren* v. *Fitchburg Railroad*, 8 Allen, 227, the principle was applied to providing for a passenger a safe and convenient way and manner of access to the train. In *Sim-*

*mons* v. *New Bedford, Vineyard, & Nantucket Steamboat Co.* 97
Mass. 361, it was applied to the duty of a carrier to protect pas-
sengers from the misconduct or negligence of other passengers.

*Gaynor* v. *Old Colony & Newport Railway,* 100 Mass. 208, was
a case where it appeared that the defendant did not provide
proper safeguards against injury for a passenger leaving the
place where he alighted from the cars.    Mr. Justice Colt said,
in the opinion : " The plaintiff was a passenger, and while that
relation existed the defendants were bound to exercise towards
him the utmost care and diligence in providing against those
injuries which can be avoided by human foresight.    He was en-
titled to this protection, so long as he conformed to the rea-
sonable regulations of the company, not only while in the cars,
but while upon the premises of the defendants; and this requires
of the defendants due regard for the safety of passengers, as well
in the location, construction and arrangement of their station
buildings, platforms and means of egress, as in their previous
transportation."    See also language of Chief Justice Shaw, in
*McElroy* v. *Nashua & Lowell Railroad,* 4 Cush. 400.

Difficulty in the application of this rule has sometimes come
from an improper interpretation of the expressions "utmost
care and diligence," "most exact care," and the like.    These do
not mean the utmost care and diligence which men are capable
of exercising.    They mean the utmost care consistent with the
nature of the carrier's undertaking, and with a due regard for
all the other matters which ought to be considered in conduct-
ing the business.    Among these are the speed which is desirable,
the prices which passengers can afford to pay, the necessary
cost of different devices and provisions for safety, and the rela-
tive risk of injury from different possible causes of it.    With
this interpretation of the rule, the application of it is easy.    As
applied to every detail, the rule is the same.    The degree of care
to be used is the highest; that is, in reference to each particular
it is the highest which can be exercised in that particular with
a reasonable regard to the nature of the undertaking and the
requirements of the business in all other particulars.    *Warren*
v. *Fitchburg Railroad,* 8 Allen, 227.    *Le Barron* v. *East Boston
Ferry,* 11 Allen, 312, 315.    *Taylor* v. *Grand Trunk Railway,*
48 N. H. 304, 316.    *Tuller* v. *Talbot,* 23 Ill. 357.

It may be assumed that the plaintiff would have ceased for the time to be a passenger if he had left the steamer and gone away for his breakfast. But he was injured before he had completed his exit. Inasmuch as he had a passenger's right of egress, this request for an instruction was rightly refused. For, while he was a passenger, the degree of care to be exercised towards him did not depend upon whether he was on the steamer, or on the plank or the slip. It was the same in either place. But in determining what is the utmost care and diligence within the meaning of this rule, it is always necessary to consider what is reasonable under the circumstances. The decision in *Moreland* v. *Boston & Providence Railroad*, 141 Mass. 31, was made to rest upon the inaccuracy of the instructions as to the degree of care required of passengers, and it is not an authority for the defendant in the present case.

In its eighth request the defendant asked for an instruction as to the rights of a passenger acting in disobedience of an order or regulation of a carrier. The evidence was undisputed, that the defendant had provided a safe and convenient place for passengers to land from the saloon deck, and that the place where the plaintiff was injured was not intended for use by passengers. The judge said in his charge, " The plaintiff does not now claim that the defendant did not furnish proper means of egress from the saloon deck, nor do I understand that the plaintiff now claims that the defendant intended the gangway which was in fact used by the plaintiff for use by passengers leaving the boat." We must therefore assume that the court and the parties treated these matters as undisputed facts of the case, and, upon these facts, a warning to the plaintiff not to leave the steamer from the gangway by which he went was a reasonable order or regulation. A passenger is bound to obey all reasonable rules and orders of a carrier in reference to the business. The carrier may assume that he will obey. And the carrier owes him no duty to provide for his safety when acting in disobedience. His neglect of his duty in disobeying, in the absence of a good reason for it, will prevent his recovery for an injury growing out of it.

This request, as applied to the admitted facts of the case, and to a fact which the jury might have found from the evidence,

contained a correct statement of the law. *Ellis* v. *Narragansett Steamship Co.* 111 Mass. 146. *Pennsylvania Railroad* v. *Zebe*, 33 Penn. St. 318. *McDonald* v. *Chicago & Northwestern Railroad*, 26 Iowa, 124, 142. *Gleason* v. *Goodrich Transportation Co.* 32 Wis. 85. We are of opinion that the jury should have been instructed in accordance with it. It was not a request for an instruction merely as to the effect of a part of the evidence upon a particular subject. It was rather a request for a statement of the law applicable to one phase of the case, which involved a consideration of all the evidence relative to that phase of it. And if by the word " notified," in the ninth request, was meant the giving of a notification intelligibly, so as to make it understood by the plaintiff, the same considerations apply also to that request. No instructions were given upon this subject, and because of this error the entry must be

*Exceptions sustained.*