## South Covington & Cincinnati Street Railway Company v. Vanice.

(Decided December 11, 1925.)

### Appeal from Campbell Circuit Court.

1. Carriers—Care Required of Carrier to Prevent Injury to Prospective Passengers in Terminal Station Stated.—It was duty of carrier inviting public to congregate in its terminal station to take notice that at certain times unusual crowds would gather, and to furnish sufficient guards to control crowd in pushing and jostling in boarding cars so as to prevent injury to passengers.

2. Carriers—Evidence Held to Charge Carrier with Knowledge that Large Jostling, and Pushing Crowd Boarded its Owl Car at Terminal Station.—Evidence held to charge carrier with knowledge that large, boisterous, and jostling crowd boarded its 1:30 a. m. owl car every night, and especially on Sunday nights.

3. Carriers—Passenger's Contributory Negligence in Attempting to Board Car in Jostling Crowd at Terminal Station Held for Jury.—Whether passenger injured while attempting to board car at terminal station was contributorily negligent in attempting to board car, knowing of the usual pushing and rushing of the crowd at such hour, held for jury.

4. Carriers—Duty to Passengers by Carrier Operating Surface Terminal Station Same as that of Carrier Operating Overhead or Underground Lines and Stations.—Duty to passengers by carrier operating terminal station, to which passengers are admitted through turnstiles, where they pay their fares before entering, is same as that of carrier operating overhead or underground lines and stations.

5. Carriers—Carrier Held to Owe Highest Degree of Care to Protect Passenger About to Board Car at Terminal Station.—Carrier must exercise highest degree of care to protect passenger who has entered its inclosed terminal station, paid his fare, and is about to board car, from injury caused by boisterous and pushing crowd attempting to board car.

6. Damages—Evidence Held to Warrant Submitting Issue of Passenger's Permanent Injury to Jury.—Evidence that nine months after injury passenger, though able to do his work of setting type, was unable to handle heavy forms, and required assistance of another to lift and handle them, held to warrant submitting issue of his permanent injury to jury.

7. Damages—Instruction as to Amount of Damages for Injuries to Passenger Held Erroneous.—Instruction permitting award of such damages, not exceeding certain sum, as would fairly compensate passenger for physical pain and mental anguish, permanent injury, and diminution of power to work and labor caused by injury, held erroneous in authorizing recovery for impairment of power "to work and labor" instead of to earn money, in authorizing recovery for both permanent injury and diminution of earning power, and it should have authorized recovery for permanent impairment of earning power to begin only when recovery for loss of time ceased.

8. Damages—Correct Measure of Damages for Permanent Injury Stated.—Where there is permanent injury, in addition to special damages, plaintiff may recover for mental and physical suffering and permanent reduction of earning power, but not for injuries to person, and also for physical and mental suffering and permanent impairment of earning power.

MATT HEROLD and GEORGE HEROLD for appellant.

HUBBARD SCHWARTZ and D. A. TAYLOR for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Reversing.

In July, 1923, appellee, a resident of Bellevue in Campbell county, Kentucky, just across the river from Cincinnati, Ohio, was engaged as a printer on the Cincinnati Enquirer, a newspaper of that city. His hours of work were from 3 p. m. until 1 a m. of the next morning, and in going to and from his work he used appellant's trolley cars operated between Cincinnati, Newport and other Campbell county cities.

It was his custom when stopping work at 1 a. m. to take the 1:30 or "owl" car at the terminal station in Cincinnati. That terminal station had been erected and

in operation for about two years in July, 1923, and he had on each morning during that period taken that car at that station for his home. That car was generally pretty well filled, and was sometimes crowded, and it was customary when the persons congregated at the terminal to take it for the crowd to rush and push and jostle each other in an effort to get on and procure seats, or desirable ones. This condition was somewhat exaggerated on each Sunday morning, at which time, as a rule, there was a larger crowd congregated to take the car.

The cars enter the terminal station in returning from Campbell county points and make a sort of loop around the terminal building, and take on passengers for the return trip after having completed the loop.

On Sunday morning, July 15, 1923, appellee, as had been his custom for about two years, went to the terminal station, passed through the turnstile after having deposited his fare, and stationed himself at a point on the platform about where he knew the car would stop to receive passengers. The car was a large one which would accommodate about 175 passengers; it had one door in front and two doors in the rear where passengers might enter, and appellee had placed himself in such position that he could conveniently and promptly enter the car through one of the rear doors. Just as the car came to a stop the conductor opened the door and appellee while attempting to enter the car, and after having stepped on one of its steps, as we gather from his evidence, was so pushed and jostled by the crowd behind him, also attempting to board the car, that one of his arms was forced through the glass of one of the windows, and his wrist severely cut by the glass.

In this action for damages against the railway company the only negligence alleged is the failure of the defendant to properly supervise, control and prevent its said passengers in its terminal from attempting thus to enter, and to enter, its said car in such a reckless and disorderly manner as to bring about the plaintiff's injuries. It is also alleged that a great number of persons were accustomed to take passage on defendant's cars at said station, and that long prior to that date the passengers, while entering defendant's cars, were accustomed to rushing, pushing and shoving in such disorderly and reckless manner as to endanger the safety of other passengers about to enter said cars, and which fact was

known to defendant, or could have been by the exercise of ordinary care.

The essential averments of the petition were put in issue, and in a separate paragraph contributory negligence of plaintiff was relied upon.

On the trial a verdict was returned for the plaintiff for $770.00, of which amount apparently $270.00 was for lost time.

The direct question is presented whether it was the duty of the carrier after having notice that upon previous similar occasions the conduct of passengers at its terminal station had been disorderly and rough, to provide or furnish upon such occasions sufficient guards or other employees to handle or control the crowds to the end that its passengers, or intended passengers, who had there congregated at its invitation, might safely board its cars without being subjected to the dangers attendant upon such rushing, crowding and jostling. The question has never directly arisen in this state, but we are not without authority on the subject from many of the states containing large and populous cities, and particularly where there are overhead or underground means of transportation furnished for passengers.

In the centers of population, under modern conditions, the transportation problem is most complicated in many of its aspects, and many complex and difficult problems are daily presenting themselves. It is obvious that in a terminal station of a large city where thousands of passengers congregate daily to be transported to different points and in different directions there are duties devolving upon the carrier which do not ordinarily, and rarely will come to a carrier, in a less crowded or populous community.

It is true that upon the occasion in question there were not exceeding 175 passengers awaiting transportation on the Campbell county car, but according to the allegations of the petition, and the evidence for the plaintiff, it was customary, particularly upon this "owl" car which left at 1:30 a. m. Sunday morning for the passengers to rush, push, crowd and jostle each other in their efforts to enter the car. There was no question of space for the crowd, for the evidence shows that the terminal station would have comfortably accommodated many more than that number; but the question is whether when defendant had knowledge from numerous previous

occurrences that this condition was brought about on each Sunday morning upon the leaving of that car, should it have anticipated a repetition, and have reasonably foreseen that some of its passengers might in such a rush be injured, and have prepared to manage and control the crowd so as to prevent that outcome.

Naturally we find from an examination of the authorities that similar questions have arisen most frequently in the thickly populated states where there are large cities and resulting congestion; and obviously the courts of such states have had occasion to give greater consideration, to such problems, and greater thought to the duty that should be imposed upon the carriers, than the courts in states where there is less congestion.

We find in them the general rule to be that, eliminating all other questions of negligence, it is the duty of a carrier maintaining a terminal station, where it invites the public to congregate and become its passengers, whenever from past experience it may be reasonably anticipated by the carrier that at a given time in its terminal there will be an unusual crowd, it must take notice of the fact that under such conditions, such crowds in attempting to board its cars will indulge the naturally selfish propensity of pushing, shoving and jostling, even to boisterousness, to the end that they may promptly board the cars, and that in such circumstances its passengers may be injured. It then becomes the duty of the carrier to furnish, to a reasonable extent, as many guards or employees as may be reasonably necessary to protect its passengers from injury.

There is an admirable statement of the rule in Coyle v. Philadelphia R. R. Co., 256 Pa. 496, where a passenger was injured, by being pushed from a platform whereon a large crowd had congregated to wait for a train. The court, in holding defendant liable, said:

> "Although a carrier is not liable for mere rudeness and bad manners on the part of its passengers, or intending passengers, and, therefore, not bound to anticipate and guard against such conduct, yet when it invites the public to use its facilities to visit parks or places of amusement, it has notice that large crowds are likely to assemble, and that proper care must be used in protecting them from injuries arising from such conduct as may reasonably be ex-

pected to occur, such as a sudden rush on the part of the crowd to obtain entrance to cars immediately upon arrival of trains at the station. Such acts on the part of a large assemblage of people, congregated for the common purpose of securing passage on a public conveyance, are not within the reasoning of the line of cases which hold the carrier is relieved from liability for damages resulting from unexpected acts of rudeness or improper conduct on the part of other passengers, or intending passengers, but are such as occur so frequently that they may be properly considered as such a natural and probable result that the carrier must recognize and guard against them.''

In Kelley v. Boston Elevated R. R. Co., 210 Mass. 454, a passenger was injured by being pushed off a platform, and the court in holding the company liable, said:

''The congestion of passengers, resulting from their number and eagerness to board cars waiting for them, was not an extraordinary circumstance, but was rather a condition which should have been foreseen from the nature of the business, and provided for by the adoption of reasonable expedients. It follows that the physical harm suffered by the plaintiff arose through the defendant's negligence in permitting a combination of passengers to press violently upon her; and, while not an assault, the wrong finally inflicted was none the less a violation of its duty, for which compensation in damages can be recovered.''

Likewise in Grugg v. Kansas City R. R. Co., 207 Mo. App. 16, the carrier was held liable for injury to an intended passenger injured by a crowd on a day when large crowds were to be expected at certain stations, the court saying:

''It is manifest from the foregoing that the likelihood of a waiting passenger being shoved or pushed onto the track and into danger from a moving car, by the pressure of the crowd struggling for places on the car, was a matter reasonably to be anticipated by the defendant. The congestion of the passengers

and their concentration toward the moving car was not an extraordinary circumstance, but a condition which past experience would require defendant to foresee and provide against by the adoption of reasonable precautions to prevent physical harm to a waiting passenger, arising out of and caused by the known tendency of crowds to thus act under such circumstances; and a failure to adopt reasonable expedients to obviate the danger to a passenger arising from the pressure of a combination of passengers thus permitted to act, is negligence rendering the carrier liable for any damage thus proximately caused.''

Again, in the Federal case of Pa. R. R. Co. v. Stockton, 106 C. C. A. 433, 184 Fed. 422, the court, in considering the liability of the carrier in a somewhat similar case to this, said:

''Under the facts proven in this case—the size of the crowd, the absence of gates, the lateness of the train, the number of the passengers boarding it, and the absence of any officials whatever to safeguard such a surging throng of people, selfishly intent, as experience shows such a crowd is, to board the cars and get seats, and apt to move forward by common impulse as a train, and especially a late one, approaches—all these are facts from which a fair-minded man might infer that the railroad had failed to exercise that supervising control over a large, inconsiderate crowd, which a due regard for the safety of passengers demanded.''

In Mulhause v. Monongahela Street R. Co., 201 Pal. 237, 11 Am. Neg. Rep. 141, the carrier permitted its platform at a park to become crowded with many more persons than could at the time be accommodated in its cars, and made no effort to control the crowd. When a car approached the crowd rushed for it, and persons who mounted the running board knocked against a woman who was thrown under the car, and it was held such a case should be submitted to the jury.

In the case of Kuhlen v. Boston & Northern Street R. Co. (Mass.) 7 L. R. A. (N. S.) 729, a prospective passenger at a subway station was injured by a crush at the

station, and in upholding the right to recover, the court said:

"It is the duty of the defendant, as a carrier of passengers for hire, to use the highest degree of care consistent with the nature and extent of its business, not only to provide safe and suitable vehicles for their carriage, but to maintain all such reasonable arrangements for control and supervision both of the passengers and of its own servants as prudence would dictate to guard its passengers, while they occupy that relation, against all dangers that are naturally and according to the usual course of things to be expected. It is bound to select and employ a sufficient number of competent servants to meet any exigency which, in the exercise of that high degree of vigilance and care to which it is held, it ought reasonably to have anticipated. This is the unvarying doctrine of our own decisions. Treat v. Boston & L. R. Corp., 131 Mass. 373; Com. v. Coburn, 132 Mass. 555; Bryant v. Rich, 106 Mass. 180, 8 Am. Rep. 311; Dodge v. Boston & B. S. S. Co., 148 Mass. 210, 2 L. R. A. 83, 12 Am. St. Rep. 541, 19 N. E. 373. And its duty to use all proper means and precautions to protect its passengers against injuries caused by the misconduct of other passengers, such as under the circumstances might have been anticipated and could have been guarded against, is no less stringent than the obligation to prevent misconduct or negligence on the part of its own servants. Simmons v. New Bedford V. & N. S. B. Co., 97 Mass. 361, 93 Am. Dec. 99; Nichols v. Lynn & B. R. Co., 168 Mass. 528, 47 N. E. 427."

Other authorities upholding this same doctrine are: McGearty v. Manhattan R. Co., 15 App. Div. 2, 43 N. Y. Supp. 1086; Dawson v. New York & B. Bridge, 31 App. Div. 537, 52 N. Y. Supp. 133; Dittmar v. Brooklyn Heights R. Co., 91 App. Div. 378, 86 N. Y. Supp. 878; Bacon v. Hudson & M. R. Co., 154 App. Div. 742, 139 N. Y. Supp. 740; Reschke v. Syracuse, L. S. & N. R. Co., 155 App. Div. 48, 139 N. Y. Supp. 555; Glennen v. Boston R. Co., 207 Mass. 497, 32 L. R. A. 470; Collins v. Boston Elevated R. Co., 217 Mass. 420, 51 L. R. A. (N. S.) 1154.

In the light of these authorities coming from the states where these questions of congestion, and the acci-

dents resulting therefrom, have most frequently been raised, and where the courts have given most thought and consideration to them, and because of the supreme importance of preserving life and limb growing out of the uncontrolled action of crowds so invited to congregate, we are impelled to hold in this case that the facts in evidence imposed upon appellant the duty to have present at the time and upon the occasion in question sufficient guards to control the unruly conduct of the crowd, and thereby furnish protection to its passengers.

It is alleged and shown by the evidence that the same conditions had existed in boarding the 1:30 a. m. car at this station practically every night for two years before this accident, and that these conditions were emphasized on Sunday mornings. From this, knowledge of these occurrences may be fairly imputed to the defendant and its officials, and having such knowledge its duty followed.

But it is said for appellant that it was entitled to a directed verdict because the evidence showed that as a matter of law the plaintiff was guilty of contributory negligence. The evidence by the plaintiff was that he placed himself on the platform where, from his past experience, he thought the rear doors of the car would be when it stopped, to the end that he might promptly board it; that as the car approached after going around the loop the whole crowd made a rush to board it and that there was pushing, shoving and jostling, and as he undertook to board the car—the first person—he was caught by the pushing and jostling crowd behind him and his arm or hand forced through the glass of the window.

The argument is that as he in common with the others in the crowd made an effort to hastily board the car, knowing as he did of the usual pushing, shoving and rushing, he took his own chances and would not have been injured if he also had not in common with the others been guilty of such conduct. But we are unwilling to say as a matter of law that this was contributory negligence; it may have evidenced, in the light of his experience, thoughtlessness as distinguished from negligence, but under the circumstances the court properly left the determination of that question to the jury. A similar argument was urged for the company in the Kuhlen case above referred to, and it appeared that the plaintiff in that case had been in similar crowds, and had seen the

same pushing and struggling, and the same failure on the part of the defendant to control the assemblage, and had even once narrowly escaped injury herself, but the court in holding that this was not negligence, as a matter of law, said:

"All these circumstances were important to be considered by the jury in passing upon the question of her due care; and their attention was called to these circumstances by the presiding judge in his charge. But they are not conclusive against her as a matter of law. The jury might say that, in spite of the failure of the defendant's servants and agents to control the crowd on previous occasions, she might depend somewhat on the hope that they would not continue to fall short of their duty."

Nor are we able to distinguish any difference between the duty of a carrier operating overhead or underground railroads, and such stations as are involved in this case. The terminal station here, it is true, was on the surface, but not only was appellant in charge of it, but it was a sort of inclosure entered by intending passengers only through turnstiles where they were required to pay their fare before entering, just as they are so required in overhead or underground stations. When the intending passenger thus by invitation enters upon the premises controlled by the carrier, and has paid his fare, he is apparently as much under the care of the carrier and as much entitled to its protection as he would be in an overhead or underground station. Of course there is a distinction, easily understood, and in several cases pointed out, where there is a crowd assembled at a street corner or crossing for the purpose of boarding a car, but where the premises are not under control of the carrier; but no such distinction is apparent between a terminal station enclosed on the surface and one enclosed either overhead or underground. We, therefore, perceive no valid or sound reason to distinguish this case from the subway and elevated railway cases.

It is likewise urged that it was error for the trial court to instruct the jury that it was the carrier's duty to exercise the highest degree of care under the facts of this case, and we are cited to certain opinions of this court, and the authorities relied on therein to the effect

that while the highest degree of care on the part of the carrier is required while the passenger is in the course of transportation on the provided vehicle, only reasonable or ordinary care is required while he is waiting in the carrier's station, or on its platform, or leaving its premises.

The facts of this case are, however, that the passenger was on the enclosed premises of the carrier; that the car upon which he intended to take passage had come to its appointed place in the station, and that he after having stepped upon the car then placed himself to the fullest degree in the position of a passenger, and because of the failure of defendant's agents and servants to properly control the boisterous crowd behind him he received his injuries. The distinction between the facts here, and those which form the basis for the rule laid down by this and other courts, is apparent; in the one case the plaintiff was only an intended passenger and had not to the fullest extent placed himself in the position of a passenger by boarding the car, while in this case not only was the plaintiff actually on the enclosed premises of the carrier, not only had he actually paid his fare, but the car upon which he was to embark had actually pulled up within the station to the point where it took on passengers, its doors had been opened, and the intending passengers invited to enter, and this plaintiff had actually stepped upon the steps of the car before he received his injury.

This court, however, in two cases has upheld as proper the imposition upon the carrier of the highest degree of care where passengers are in the act of alighting from its cars. In the case of Louisville Ry. Co. v. Park, 96 Ky. 580, the carrier had negligently permitted one of the steps of its car to become worn and the mud to accumulate thereon which caused a passenger alighting to slip and fall and receive an injury, and under such circumstances the highest degree of care was imposed.

Likewise in the case of South Covington & Cincinati Street Ry. Co. v. Markel, 168 Ky. 625, the utmost degree of care was imposed by the instruction, and upheld by this court, where the carrier had permitted snow and ice to accumulate on the steps of its car, and the passenger had been injured in alighting therefrom. See also Savage v. Ill. Cen. R. R. Co., 113 Ky. 896.

We cannot distinguish the cases where that degree of care was imposed when a passenger was alighting, from this one where the passenger was actually boarding a car on the enclosed premises of the carrier.

It will likewise be seen from the Kuhlen case (Mass.) above quoted from that the highest degree of care was there imposed, even though it does not appear from the opinion that the passenger had actually boarded or stepped upon the car at the time of his injury.

The further contention is that it was error for the court to submit to the jury the question of permanent injury under the evidence. The evidence showed that appellee had some severe cuts from the glass at and around his wrist, and that he was required to be away from his work for five weeks thereafter, and had then taken up his work and continued it; and while it showed he was able so far as the actual setting of type was concerned to do his work as well as he previously had, it showed in addition that his wrist, even at the time of the trial, nine months after the injury, was so weak as a result of the accident that he could not handle the forms which his work required him to handle in the printing office, but that another had to and did lift and handle them for him   Under this evidence as to his condition nine months after the injury it was not error to authorize a recovery for permanent injury.

But because of an error in the instruction on the measure of damages it becomes necessary to reverse this judgment.  That instruction is as follows:

"If you find for plaintiff you will award him such sum in damages, not exceeding $2,000.00, as you believe from the evidence will fairly compensate him for his physical pain and mental anguish, if any, caused by his injury; for his permanent injury, if any caused by his injury, and his diminution of his power to work and labor, if any, caused by his injury."

In the first place, the instruction is erroneous in authorizing a recovery for the impairment of the plaintiff's power "to work and labor." The approved form and the correct measure is the impairment of his power to earn money.

Furthermore, the instruction appears to authorize a recovery for the plaintiff's permanent injury, and like-

wise to authorize a recovery for the diminution of his power to earn money, or to work and labor.

Where there is a permanent injury, in addition to special damages there may be a recovery for mental and physical suffering and the permanent reduction of the plaintiff's power to earn money; but it is not contemplated that he should receive damages for injuries to his person, and in addition damages for physical and mental suffering, and for the permanent impairment of his power to earn money. Such an instruction necessarily authorizes the assessment of double damages. N. C. & St. L. Ry. Co. v. Henry, 158 Ky. 88.

Likewise the instruction in so far as it authorized a recovery for loss of time and for the permanent impairment of plaintiff's power to earn money, should authorize recovery for permanent impairment to begin only when the recovery for loss of time should cease. L. & E. Ry. Co. v. White, 182 Ky. 267.

There are other criticisms of the instructions, but an examination of them fails to make their merit apparent.

Because, however, of the error in the one instruction the judgment must be and is reversed, with directions to grant appellant a new trial, and for further proceedings consistent with this opinion.

Whole court sitting.